UNITED STATES of America, Plaintiff,

v.

**BOARD OF EDUCATION OF the CITY OF CHICAGO, Defendant.**

**No. 80 L 5124.**

United States District Court, N. D. Illinois, E. D.

Jan. 6, 1981.

---

Thomas P. Sullivan, U. S. Atty., Canella E. Henrichs, Asst. U. S. Atty., U. S. Atty.'s Office, Chicago, Ill., Drew S. Days, III, Alexander C. Ross, Thomas M. Keeling, Michael H. Sussman, Civil Rights Div., Dept. of Justice, Washington, D. C., for plaintiff.

Robert C. Howard, Chicago, Ill., for defendant.

Thomas I. Atkins, Teresa Demchak, Asst. Gen. Counsel, Charles E. Carter, James I. Meyerson, New York City, Norman Chachkin, Washington, D. C., Aldus S. Mitchell, Chicago, Ill., for intervenor Metropolitan Council—NAACP.

Virginia Martinez, Raymond Romero, Mexican American Legal Defense and Educational Fund, Chicago, Ill., for intervenor Pilsen Neighbors Community Council.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This action, filed September 24, 1980 by the United States against the Board of Education of the City of Chicago (the "Board"), is the intended vehicle for the desegregation of Chicago's public schools on a system-wide basis. On the same date that the action was brought, this Court entered a Consent Decree that the United States and the Board had agreed upon after extended negotiations dating back to April 1980.

Within a week after entry of the Consent Decree, the Metropolitan Council-National Association for the Advancement of Colored People ("NAACP") filed a motion for leave to intervene as a party plaintiff, together with a proposed complaint in intervention on behalf of Black American citizens in the Chicago area (present public school students, parents and prospective parents).[1] Then in mid-November counsel for the Mexican American Legal Defense and Educational Fund and the Puerto Rican Legal Defense and Educational Fund ("MALDEF–PRLDEF") filed a like motion and complaint, seeking intervention by several Hispanic community organizations and individuals on behalf of all present Hispanic public school students and all Hispanic parents and prospective parents in the Chicago area. Both the United States and the Board oppose each motion to intervene. Both motions have been extensively briefed by the parties and are now ready for decision.

It is important first to emphasize what the Court is *not* called upon to decide: the question of significant involvement of NAACP and MALDEF–PRLDEF (and their respective constituents) in the Board's shaping of the desegregation plan mandated by the Consent Decree. Whether or not NAACP and MALDEF–PRLDEF and their

---

1. Since then NAACP has tendered a proposed Amended Complaint in Intervention, adding as proposed intervenors another NAACP branch and a young Black student as a proposed class representative. For convenience this opinion will use the term "NAACP" or "NAACP plaintiffs" collectively to refer to all the proposed intervenors in the Amended Complaint in Intervention.

constituents are made formal parties to the litigation (which would be the consequence of granting intervention), their input to the Board in defining the content of the desegregation plan will unquestionably be welcomed by and invaluable to the Board. Each of the organizations has a distinguished history of involvement and achievement in this area of the law, and the Court would expect the Board to seek out their views and promptly to provide them with whatever background information and data may conveniently and reasonably be furnished them and would facilitate their providing input to the Board.

It is not simply that the Consent Decree provides (Section 17):

> The Board will receive and consider comments and recommendations from all persons and groups during the development of the desegregation plan.

Rather the Court is confident that the Board recognizes the importance of maximum community participation in the development of the plan, for only by such meaningful participation can the all-important element of community *acceptance* of the plan be fostered. NAACP and MALDEF–PRLDEF, and others committed to implementing the constitutional guarantees of equality, can and should be major allies of the Board and the United States in correcting the existence and effects of racial isolation and in promoting the best possible education for *all* students in the Chicago public school system.

▮ Having so said, the Court now turns to the motions to intervene. For the reasons stated in this memorandum opinion and order, each motion is denied. Such denial is without prejudice to the possible renewal of such motions after the Board has filed its proposed desegregation plan. We would of course, in light of our initial comments, welcome the involvement of either or both applicants as friends of the court rather than as formal parties litigant.

*Effect of the Consent Decree*

This case is in an unusual posture for considering intervention: Here the Consent Decree, requiring the prompt development and implementation of a desegregation plan, has been entered *without* the need to establish that the Board's predecessors in office have violated the Constitution.[2] Thus the case can move directly to the determination of *relief* against the acknowledged pattern of racial isolation, without previously having to litigate the issue of the Board's *liability*.

That result is obviously desirable from the perspectives of both legal and public policy considerations. As the United States put it in its initial memorandum requesting entry of the Consent Decree:

> Settling complex lawsuits before trial saves judicial resources as well as the substantial costs of litigation, in time, person-power and dollars, to the parties. In cases involving public bodies, like school boards, the incentive to settle and conserve public funds is even greater. This is undoubtedly true in Chicago where the school board has been struggling for nearly a year against insolvency.
>
> Moreover, in school desegregation cases, prompt resolution, through an equitable and constitutionally-acceptable settlement, allows for the speedy vindication of the rights of minority children who have been denied equal protection of the laws and equal educational opportunity. Where possible, these fundamental rights should be accorded sooner, rather than later.
>
> Finally, in public law litigation, where compliance depends in part upon public acceptance and the least possible acrimony between the parties, settlement is particularly welcome for it signifies cooperation between the parties. In this instance, the United States recognizes that the successful desegregation of the public schools of Chicago, while continuing to be

---

2. In the Consent Decree the Board neither admits nor denies the allegations of the Complaint that there has been intentional racial and ethnic origin discrimination against students by the Board's maintenance of a segregated school system.

a constitutional duty of local officials, will be furthered by the willing and expeditious assistance of state and federal agencies. And the prompt and voluntary cooperation of these several levels of government will best be guaranteed through the entry of this Consent Decree.

Consent decrees are, as the name implies, consensual—essentially contractual—in nature. They occupy a favored place in the resolution of disputes, and our Court of Appeals has less than a year ago underlined the applicability of that principle to school desegregation litigation in *Armstrong v. Board of School Directors of City of Milwaukee*, 616 F.2d 305, 312–13, 318 (7th Cir. 1980):

> It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement. [citing cases] In the class action context in particular, "there is an overriding public interest in favor of settlement." *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977). Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.
>
> *       *       *       *       *       *
>
> Indeed, it appears that school desegregation is one of the areas in which voluntary resolution is preferable to full litigation because the spirit of cooperation inherent in good faith settlement is essential to the true long-range success of any desegregation remedy. [citing cases] A

remedial decree reached through agreement between the parties may, because of the community cooperation it inspires, more effectively implement the constitutional guarantee of equal protection than a seemingly more stringent court-ordered remedy which the community views as imposed upon it from the outside.

### Effect of Intervention

Intervention at this stage of the proceedings would deflect the litigation from its essential goal of producing at the earliest feasible date a desegregated school system for the Chicago public schools, and more importantly, for the very classes whose rights the intervenors seek to protect. It will be difficult enough to meet the tight timetable specified in the Consent Decree for adoption and implementation of a desegregation plan: adoption of the plan by the Board by March 11, with immediate transmittal to the Department of Justice and the Court, and implementation of the plan for the school year beginning September 1981.

Suppose that intervention were to open up the issue of the Board's liability,[3] an issue that the current Board—in office for less than a year—would contest vigorously. In that case the entire process of reaching the goal shared by the litigants, the parties, the intervenors and the Court would clearly be slowed by one or more years.

Assume on the other hand that the determination of liability could somehow be skirted or merely deferred.[4] Even then, the

---

3. Like the initial Complaint of the United States, whose correctness the Board does not concede in that respect, each of the proposed complaints in intervention (NAACP ¶¶ 1, 18–22 and MALDEF–PRLDEF ¶¶ 1, 21, 29) charges the Board with unconstitutional and illegal conduct violative of the Fourteenth Amendment (NAACP refers to the Thirteenth Amendment as well) and the Civil Rights Act of 1866, 1871 and 1964.

4. In response to the Court's directive to address the impact of the class action allegations of their complaint in intervention on the issues now before the Court, the NAACP plaintiffs

dealt only with a limited aspect of the problems presented. But in so doing, they said in part:

> We recognize that our action could have been filed as a separate and independent action. However, in the interest of judicial economy, we instead have sought to intervene in the within action and postpone any determination on the question of the liability of the defendant Board until it has had an opportunity to prepare and submit its proposed desegregation plan. If, after review of that plan, we believe that it eliminates, to the fullest practicable extent and in an equitable manner, the racial segregation of students, faculty, staff and facilities within the Chicago

need to deal with the special issues of class representation introduced by the applicants for intervention [5] would similarly dilute the allocation of limited resources by requiring the Board, the United States and the Court to address issues that do not themselves promote the substantive purpose of the litigation. As the United States' memorandum in opposition to intervention said:

> ... it is clear that prematurely injecting the complications of multiple interventions and/or class certification proceedings into the case at this time could unduly delay adjudication of the rights of the original parties.

As against those factors, it is difficult to identify the positive ends that granting intervention at this time would serve. Both the present parties and the NAACP plaintiffs agree that the prospective intervenors, who are not parties to the Consent Decree, are not bound by it.[6] NAACP's supplemental letter addressed to the class action issues makes plain that whether the Court were to *grant* or *deny* intervention, the effect on this litigation would really be identical (see the language quoted in footnote 4, coupled with the following language):

> Consequently, in seeking to intervene in this case, we specifically reserve the right to challenge, on constitutional grounds, any plan developed by the Board pursuant to the Consent Decree, and if necessary to move that the Consent Decree be

set aside and a full trial on the constitutional liability of the defendant Board be held ....

Therefore, should this Court deny or condition our intervention, we would, in order to protect the rights of our clients, file a separate and independent class action. We would file any such action as a related case and move to consolidate it with the within action and also seek to stay the proceedings of any such independent action pending the development and submission of the defendant Board's proposed plan. We suggest to the Court, however, that by permitting us to intervene herein and to have access to information and the negotiations concerning the planning and development of the defendant's proposed plan, the need to litigate the question of the liability of the Chicago Board may be negated if the plan which is ultimately submitted to this Court is one which is acceptable to all parties.

Though its reply brief (pages 8–9) indicates that the letter's reference to "negotiations" was inadvertent, NAACP's argument in the reply brief that it is necessary for it to "have prior access to and review certain base and background data" does not rise to the level of overcoming the objections already noted in this opinion.

---

system, then, of course, we would have no need to proceed to litigate our lawsuit.

5. Fed.R.Civ.P. 23(c)(1) requires that the Court determine whether an action is to be maintained as a class action "as soon as practicable after [its] commencement...." It is of course a familiar phenomenon in civil rights actions, and perhaps especially where segregation is at issue, that not only the entire community but even each of its plainly identifiable components (such as Blacks or Hispanics) does not speak with a single voice. Class representation is not a simple issue; there may be meaningful subclasses within the class that each prospective intervenor here claims to represent. Whatever the ultimate conclusion on that score, however, there is no question that there would be a major cost in time and resource allocation. And even assuming that the determination under Rule 23(c)(1) is favorable, the same comment is certainly applicable to the need that would then arise, to deal with the procedural

problems of giving notice and holding hearings under Rule 23(d)(2) and (viewing adoption of the ultimate plan as a "compromise" because it would not be the result of full litigation of liability or of the plan's terms) Rule 23(e) as well. See *Armstrong*, 616 F.2d at 313–14.

6. MALDEF–PRLDEF alone took the position that intervention should be granted because the Consent Decree would be binding on the intervening plaintiffs on res judicata grounds in any event. That position is incorrect as a matter of law, *United States v. Allegheny-Ludlum Industries, Inc.*, 517 F.2d 826, 845 (5th Cir. 1975) and cases cited therein; *cf. General Telephone Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 332–33, 100 S.Ct. 1698, 1707–8, 64 L.Ed.2d 319 (1980). Because the reply memorandum of MALDEF–PRLDEF was silent on the issue, they may indeed have abandoned the argument.

MALDEF and PRLDEF assert a comparable interest on behalf of the Hispanic community, as to which the practical considerations are of course no different. Here too the input of the organizations' recognized expertise can be provided outside of the direct litigation context, as an aid to the Board in its development of the desegregation plan in accordance with the Consent Decree.

As to each of the prospective intervenors, then, the real goals of the litigation can be well served without introducing the potentially disruptive impact of formal intervention.[7] Each can seek from the Board the background information it believes it needs. In the Board's own educated self-interest in maximizing community support, and in providing its own planners with the best resource material for development of the plan, the Board may be relied upon to deal responsibly with such requests for information. And of course the same observation applies as to the Board's willingness to receive planning suggestions, either from the prospective intervenors or from any other sources, to assist it in its development of the ultimate plan.

### Legal Principles Governing Intervention

Against the background of policy and practical considerations already discussed, the legal principles controlling intervention do not need extended review. Both prospective intervenors rely on Fed.R.Civ.P. 24(a)(2):

> Upon timely application anyone shall be permitted to intervene in an action: . . . when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Alternatively each seeks to invoke Fed.R. Civ.P. 24(b)(2):

> Upon timely application anyone may be permitted to intervene in an action: . . . when an applicant's claim or defense and the main action have a question of law or fact in common. . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

To qualify for intervention *as of right* under Rule 24(a)(2), an applicant must thus meet each of four conditions:

> (1) The application must be timely.

> (2) The applicant must claim an interest relating to the transaction that is the subject of the action.

> (3) The applicant must show that its ability to protect that interest may as a practical matter be impaired or impeded by disposition of the action.

> (4) The applicant's interest must not be adequately represented by the existing parties.

Failure to meet any one of the conditions is sufficient to deny intervention as of right, *NAACP v. New York*, 413 U.S. 345, 369, 93 S.Ct. 2591, 2604, 37 L.Ed.2d 648 (1973). In the present case, both sets of applicants fail on two of the four grounds and have doubtful standing on a third.[8]

### Timeliness

Timeliness in the usual sense—that is, whether the applications to intervene were filed promptly after the suit was brought—certainly cannot be quarreled with. But two observations are appropriate that, in the Court's view, cast serious doubt on the "timeliness" of the motions in the context of this case:

> (1) Desegregation of the Chicago school system is scarcely a new issue.

---

7. This is said without speculating on the possibility, advanced by the Board, that there may be other potential applicants for intervention waiting in the wings to see the Court's disposition of the present motions. Were that the case, the potential disruption would be different in degree but not in kind.

8. There is of course no question that both legitimately claim an interest relating to the "transaction" that is the subject of this action. Thus the second of the four conditions is clearly satisfied by each.

NAACP's motion reflects that it has lodged complaints since the early 1960's challenging the racial segregation and identification of Chicago schools as "the direct, natural, foreseeable and intended consequence of actions, omissions, policies and practices of the Board of Education of the City of Chicago." Earlier action by NAACP or by MALDEF–PRLDEF would have obviated the present possibility that relief could be delayed because of the need *now* to address the question of liability or the various class-oriented issues. This Court should not be misunderstood as criticizing anyone for having sought to accomplish the goal of desegregation through negotiation rather than litigation. Quite the contrary is true. For the reasons stated by our Court of Appeals in the *Armstrong* case and by the United States in this case, each quoted earlier in this opinion, successful negotiation can be far more constructive than litigation in this sensitive area of the law. Nonetheless, it is true that the prospective intervenors did wait to act until the United States had completed such negotiation with the Board and had instituted this action. That fact does bear on whether it is appropriate to risk undermining the constructive outcome of that negotiation, by opening up problems not posed by the Consent Decree and the procedures it envisions.

(2) Timeliness may also involve the question whether intervention in this case is sought too early, rather than the usual issue of whether application is made too late. As stated in *Stallworth v. Monsanto Co.*, 558 F.2d 257, 265 (5th Cir. 1977), it is far sounder to decide the timeliness of intervention in terms of the time that it becomes plain that an applicant's interest is not in fact represented by the existing parties, rather than simply looking at the time the lawsuit is filed:

> It [a rule focusing on the *filing* of suit] would encourage individuals to seek intervention at a time when they ordinarily can possess only a small amount of information concerning the character and potential ramifications of the lawsuit, and when the probability that they will misjudge the need for intervention is correspondingly high. Often the protective step of seeking intervention will later prove to have been unnecessary, and the result will be needless prejudice to the existing parties and the would-be intervenor if his motion is granted, and purposeless appeals if his motion is denied. In either event, scarce judicial resources would be squandered, . . . .

From that perspective, "timeliness" is closely related to the two conditions of Rule 24(a)(2) that applicants plainly fail to satisfy. Those conditions are discussed in the following two sections of this opinion.

*Applicants' Ability To Protect Their Interests*

This Court's denial of intervention at this time, with the potential that applicants may renew such motions *after* the Board files its desegregation plan, would in no way impair or impede the prospective intervenors' ability to protect their interests. If the parties and the Court were confronting active litigation of the question of *liability*, the potential for such impairment might be materially different. But that is not the case here.

As to this criterion the condition of Rule 24(a)(2) is expressly phrased "as a practical matter." NAACP itself recognizes (and the same comment applies to MALDEF–PRLDEF as a substantive matter) that the Board may produce a plan under which the NAACP plaintiffs "would have *no need to* proceed to litigate [their] lawsuit." Indeed, the NAACP plaintiffs have expressly recognized the appropriateness of staying the proceedings even of an *independent* lawsuit, if they were to institute one, pending the development and submission of the Board's proposed plan. It is thus a complete answer to point to this condition of the Rule, coupled with the right (already discussed) of the applicants to institute their own actions because the Consent Decree does not bind them under res judicata or collateral estoppel principles.

This Court does not intend by pointing out the availability of such independent rights to "foster a multiplicity of new lawsuits over the same complicated and emotional issue" posed by this action. *Hines v. Rapides Parish School Board*, 479 F.2d 762, 765 (5th Cir. 1973). It would instead urge that the applicants consider the potential for intervention when the issues have been sharpened in the context of a real, rather than a hypothetical, proposed plan of desegregation—when any arguable failure to protect their interests or inadequacy of representation (next discussed) may be tested in the crucible of reality. As the Court of Appeals put it in *Hines, id.*:

> The petition for intervention would bring to the attention of the district court the precise issues which the new group sought to represent and the ways in which the goal of a unitary system had allegedly been frustrated. The district court could then determine whether these matters had been previously raised and resolved and/or whether the issues sought to be presented by the new group were currently known to the court and parties in the initial suit. If the court determined that the issues these new plaintiffs sought to present had been previously determined or if it found that the parties in the original action were aware of these issues and completely competent to represent the interests of the new group, it could deny intervention. If the court felt that the new group had a significant claim which it could best represent, intervention would be allowed.

*Adequacy of Representation*

■ This Court is bound by the test stated by our Court of Appeals in *United States v. Board of School Commissioners of City of Indianapolis*, 466 F.2d 573, 575 (7th Cir. 1972):

> [R]epresentation is adequate if no collusion is shown between the representative and an opposing party, if the representative does not have or represent an interest adverse to the proposed intervenor and if the representative does not fail in the fulfillment of his duty.

That rule echoes the strict requirement of a "very compelling showing" that representation of the public interest by the United States is not adequate in suits such as this, 7A Wright & Miller, Federal Practice and Procedure § 1909, at 528.

No such showing has been made by the applicants in this case. Instead they argue for a lower threshold for intervention, on the claimed authority of the statement in *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10, 92 S.Ct. 630, 636 n.10, 30 L.Ed.2d 686 (1972) to the effect that the "burden of making a showing [of inadequate representation] should be minimal." But it cannot be presumed, as MALDEF–PRLDEF argue, that our Court of Appeals was unaware of or failed to consider the *Trbovich* decision, handed down several months before its own decision in *Indianapolis*. *Trbovich* can readily be reconciled with *Indianapolis* by limiting its expression to the specialized circumstances involved there, where federal jurisdiction was exclusive and private actions were barred by law (see *Commonwealth of Virginia v. Westinghouse Electric Corp.*, 542 F.2d 214, 216 (4th Cir. 1976); *United States v. Allegheny-Ludlum*, 517 F.2d at 845). In that sense *Trbovich* would not be regarded as creating a new test for the general application of Rule 24(a)(2) to cases like *Indianapolis* or this one.

But even a broader reading of *Trbovich*, as stating a new and lower hurdle for intervention generally, does not require the granting of intervention here. Even courts that have given *Trbovich* such broad applicability have continued to hold that intervenors have the burden of overcoming a presumption of adequate representation that arises when they have the same ultimate objectives as a party to the existing suit. *United States Postal Service v. Brennan*, 579 F.2d 188, 191 (2d Cir. 1978). And that presumption is especially appropriate when the party to the existing suit "is a governmental body or officer charged by law with representing the interests of the absentee." *Commonwealth of Pennsylvania v. Rizzo*, 530 F.2d 501, 505 (3d Cir. 1976). In this

case there is no plausible showing of divergence of interests between the United States and the applicants.[9] Thus *Trbovich* does not alter the result compelled by *Indianapolis.*

## Permissive Intervention

All the considerations already discussed apply with at least equal force in making a determination under Rule 24(b)(2). Moreover, that Rule mandates that this Court exercise its discretion in light of "whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." It should be clear from the earlier sections of this opinion that such potential delay and prejudice are meaningful possibilities, and that prospect reinforces a denial of permissive intervention.

## This Court's Role in the Litigation

One aspect of the briefs submitted on the pending motions is of serious moment, extending far beyond their limited scope to the ultimate resolution of this action. This Court disagrees sharply with the implication, expressed more than once by counsel for the Board (see for example pages 11, 17–18 and 45–46 of the Board's brief in opposition to the NAACP motion), of a severely limited role to be occupied by this Court in protecting the constitutional rights of the persons represented by the applicants for intervention, as well as the constitutional rights of all other persons impacted by the Chicago public school system.

This Court does *not* view itself as a passive receptacle for the Board's desegregation plan, to respond in a Pavlovian way only if the bell is rung by a stated disagreement between the Board and the United States.[10] It has not abdicated its constitutional responsibilities, and if the litigants were to *agree* on a plan that did not conform to the Constitution[11] this Court would reject that plan and send the parties back to the drawing board. This Court has specifically retained jurisdiction of this action for all purposes under Paragraph 7 of the Consent Decree, by specific agreement of the parties. In this Court's opinion, the provision of Section 18 for resolving any disagreements between the parties cannot and does not *exclude* (expressly or by inference) this Court's right and duty to determine whether the plan meets the requirements of the United States Constitution.

■ If the Board meant only to contrast the situation here with the usual school desegregation case, in which the responsibility for actually preparing the desegregation plan has devolved on the courts, there is no disagreement between us. Under the Consent Decree the primary responsibility for developing the plan is on the *Board*, and so long as its product is within the "broad range of constitutionally acceptable plans" (Consent Decree ¶ 3.1), the Court will of course not superimpose its own views of what other constitutional means might be preferable. As our Court of Appeals put it in reviewing the ultimate settlement in the Milwaukee school desegregation (*Armstrong*) case, 616 F.2d at 315, in a related though somewhat different context:

> Judges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel.

9. This Court will certainly not infer, from the recent congressional efforts to enact legislation inhibiting new lawsuits by the United States to require school busing, that the Department of Justice is not to be trusted with vigorous prosecution of an already-filed action like this one, which could involve such a requirement.

10. Quite the contrary was stated by Assistant Attorney General Drew Days III when the case and the proposed Consent Decree were first brought to the court:

> The plan itself must be approved by this Court. So it is something that is ultimately

in the hands of this Court, and to the extent that third parties wish to be heard, I would assume that they would have that right, not only before the Board, but before this Court as well. . . .
By March of 1981 . . . there should be a final plan before this Court for its consideration, and we would like to think, its approval.

11. No inference should be drawn that such would be the case, but the point has to be made in light of the Board's repeated articulation of a different notion.

This Court does not plan to do that, but it also plans to live up to *its* obligations under the Constitution, just as the Board and the United States must live up to theirs.

### Conclusion

All of the NAACP plaintiffs and the applicants for intervention represented by MALDEF–PRLDEF are denied leave to intervene in this action under either Fed.R. Civ.P. 24(a)(2) or 24(b)(2). This decision is without prejudice to the possible renewal of such motions after filing of the Board's proposed desegregation plan, and also without prejudice to a motion by either party at any time for leave to appear as *amicus curiae* in this litigation.