UNITED STATES of America, Plaintiff,

v.

SOUTH BEND COMMUNITY SCHOOL CORPORATION; James P. Scamman, Superintendent; The Board of School Trustees of the South Bend Community School Corporation; Robert M. Sweeney, Donald W. Yates, Marilyn Kalamaros, Eileen Bender, Hollis E. Hughes, Jr., Anthony V. Luber, William L. Wilson, members of the Board of School Trustees, Defendants.

No. S 80–35.

United States District Court,
N. D. Indiana,
South Bend Division.

April 17, 1981.

David T. Ready, U. S. Atty., South Bend, Ind., for plaintiff.

Bruce R. Bancroft and Franklin A. Morse, II, South Bend, Ind., for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

### I.

On February 8, 1980, this action was commenced by the filing of a complaint by the Attorney General of the United States under Title IV of the Civil Rights Act of 1964 and under the Equal Educational Opportunities Act of 1974. Subject matter jurisdiction was predicated upon Section 407(a) and (b); Section 207 of the Equal Educational Opportunities Act of 1974, 20 U.S.C. 1706; and the statute providing original jurisdiction in the district courts of all civil actions brought by the United States as a plaintiff, 28 U.S.C. 1345.

 These statutes fix original subject matter jurisdiction in this Court. See, e. g., *United States v. Board of School Commissioners of City of Indianapolis*, 332 F.Supp. 655 (S.D.Ind.1971), *aff'd*, 474 F.2d 81 (7th Cir. 1973), *cert. den.*, 413 U.S. 920, 93 S.Ct. 3066, 37 L.Ed.2d 1041 (1973); *Spangler v. Pasadena City Board of Education*, 311 F.Supp. 501 (C.D.Cal.1970), *aff'd*, 427 F.2d 1352 (9th Cir. 1970). A district court in a school desegregation case, upon issuing a desegregation order, retains jurisdiction to make and enforce such decrees in equity as are necessary to accomplish constitutional objectives. *United States v. School District 151 of Cook County, Illinois*, 286 F.Supp. 786 (N.D.Ill.1968), *aff'd*, 404 F.2d 1125 (7th Cir. 1968), on remand, 301 F.Supp. 201 (N.D. Ill.1969); *United States v. Board of School Commissioners of City of Indianapolis, supra*, 322 F.Supp. at 677. Thus it was that the original Consent Decree entered in this case provided that "the Court shall retain jurisdiction of this action for all purposes." *Consent Decree*, February 8, 1980, ¶ 12.

Although not binding upon this Court, the opinion of Judge Shadur in *U. S. v. Board of Education of the City of Chicago*, 88 F.R.D. 679 (N.D.Ill.1981), provides an interesting analogue to the course of pro-

ceedings reflected in the record of this case. In the *Chicago* case, as is the situation here, the complaint was filed and a consent decree was entered on the same date. As is the situation here, that consent decree was agreed upon by the United States and the Board of Education following extended negotiations. And, as is the situation here, the school board in the consent decree neither admitted nor denied the allegations of the complaint that there had been intentional racial and ethnic origin discrimination against students by the Board's maintenance of a segregated school system. Noting that, "this case is in an unusual posture for considering intervention", the district court in the *Chicago* case described the effect of the consent decree as follows:

> Here the Consent Decree, requiring the prompt development and implementation of a desegregation plan, has been entered without the need to establish that the Board's predecessors in office have violated the Constitution. Thus the case can move directly to the determination of relief against the acknowledged pattern of racial isolation, without previously having to litigate the issue of the Board's liability. 88 F.R.D. 681.

"That result," said Judge Shadur, "is obviously desirable from the prospectives of both legal and public policy considerations." *Id.*

In support of his entry of the consent decree, Judge Shadur relied upon *Armstrong v. Board of School Directors of the City of Milwaukee*, 616 F.2d 305, 312–13, 318 (7th Cir. 1980). Had he wished, the district judge could also have relied upon *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 469 F.Supp. 836 (N.D.Ill.1979), *aff'd*, 616 F.2d 1006 (7th Cir. 1980).

*Metropolitan Housing* was an action brought to remedy conduct of the Village of Arlington Heights alleged to have been racially discriminatory in violation of the Fourteenth Amendment and the Fair Housing Act of 1968, 42 U.S.C. 3601, et seq. Intervening landowners and a neighboring village sought to set aside a previously entered consent decree on grounds that, because there was no finding or admission

that the defendant had committed a constitutional or statutory violation, the entry of the consent decree would effect unauthorized expansion of the jurisdiction of the federal court. 469 F.Supp. at 850. Following a discussion of applicable Supreme Court cases [1] and other authorities, the district court in *Metropolitan Housing* concluded that "it can enter a consent decree absent proof or admission of a constitutional or statutory violation." 469 F.Supp. at 851. Recognizing the principle that "the law generally favors and encourages settlements", the Seventh Circuit affirmed. 616 F.2d 1006. Jurisdiction, therefore, was not improperly or unlawfully expanded.

Thus, by *Metropolitan Housing*, the Seventh Circuit approved the entry of a consent decree entered in a case brought to rectify racial discrimination in violation of federal statute and the Constitution absent proof or admission of liability on the part of the defendant. The only distinction is that *Metropolitan Housing* was not a school desegregation case.

The issue faced by the Seventh Circuit in *Armstrong* was whether, after 15 years of litigation, it was possible to "settle" the remedial portion [2] of a school desegregation class action. 616 F.2d at 307–8, 316. Following careful analysis of employment discrimination cases, the court found that "settlement is an appropriate method of arriving at a school desegregation remedy". 616 F.2d at 317–318. The Circuit Court then concluded:

> [S]chool desegregation is one of the areas in which voluntary resolution is preferable to full litigation because the spirit of cooperation inherent in good faith settle-

ment is essential to the true long-range success of any desegregation remedy. 616 F.2d at 318. (citations omitted)

In *Metropolitan Housing*, the court approved a consent decree covering the issue of liability in a case involving racial discrimination in housing. In *Armstrong*, the court approved a consent decree covering the issue of the appropriate remedy in a case involving racial discrimination in the public schools. Thus it is obvious that a consent decree is an appropriate resolution of the litigation at this stage.

 It is now axiomatic that school authorities have an affirmative duty to eliminate from the public schools all vestiges of state-imposed segregation as of the date on which *de jure* segregation became illegal under *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). It is also clear there is no constitutional duty imposed upon school authorities to remedy the effects of racial imbalance or to maintain any particular racial balance in the public schools insofar as it relates to purely *de facto* segregation unaided by any state action. See *Swann v. Charlotte-Mecklenburg Board of Education, supra; Board of School Commissioners of the City of Indianapolis v. United States*, 474 F.2d 81 (7th Cir. 1973), *cert. den.*, 413 U.S. 920, 93 S.Ct. 3066, 37 L.Ed.2d 1041 (1973).

 Notwithstanding there is no constitutional obligation to alleviate racial imbalance not caused by school boards, it is evident that under Indiana law they may do so should they desire. In fact, in order to effectuate public policy established by our Legislature,[3] the Indiana Equal Educational Opportunity Act encourages them to do so:

---

1. *Swift & Co. v. United States*, 276 U.S. 311, 48 S.Ct. 311, 72 L.Ed. 587 (1928); *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); *Hills v. Gautreaux*, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976).

2. Pursuant to the terms of the settlement agreement approved by the district court and at issue on appeal, the school board had agreed not to appeal from the district court's decisions finding that it had violated the Equal Protection Clause and that the violations had had a sys-

temwide impact requiring a systemwide remedy. 616 F.2d 309, n. 5. To this extent, therefore, the issue of liability was the subject of compromise, settlement and a consent decree even in *Armstrong*.

3. Section 1 of the Indiana Equal Educational provides:

> It is the public policy of the state of Indiana:
> (a) To provide, furnish and make available equal, nonsegregated, nondiscriminatory educational opportunities and facilities for all regardless of race, creed, national origin, color or sex;

... [T]he governing body of any school corporation ... may take any affirmative actions that are reasonable, feasible and practical, to effect greater integration and to reduce or prevent segregation or separation of races in public schools *for whatever cause.* These actions may include, but are not limited to, site selection, revision of school district, curricula, or enrollment policies to implement equalization of educational opportunity for all. I.C. § 20–8.1–2–3. (emphasis added.)

The long-established right of school boards to eradicate the deleterious effects of segregation irrespective of cause was recognized by the Supreme Court of the United States in *Swann* :

School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities... 402 U.S. at 16, 91 S.Ct. at 1276, 28 L.Ed.2d at 566–67.

Following this pronouncement of the Supreme Court, in *Higgins v. Board of Education of the City of Grand Rapids,* 395 F.Supp. 444 (W.D.Mich.1973), *aff'd,* 508 F.2d 779 (6th Cir. 1974), the court first referred to a joint policy statement adopted by the Michigan Board of Education and the Michigan Civil Rights Commission and noted that:

... uniformally, it is acknowledged that elimination of racial imbalance, or *de facto* segregation, is desirable in and of itself, regardless of cause, and that it is educationally important to children of all races in preparing them to exist harmoniously in a pluralistic, melting-pot society. 395 F.Supp. at 486.

The court then readily acknowledged "the right of school authorities, under their broad powers to achieve better racial balance and to eliminate *de facto* segregation even absent a constitutionally imposed obligation to do so." *Id.*

■ As a matter of historical fact, the record in this case establishes that, at least by the latter part of 1979, the Board of Trustees of the South Bend Community School Corporation was moving toward voluntary integration of its schools. Whether or not the defendants would have voluntarily adopted a plan of desegregation fulfilling its constitutional obligations is, of course, a matter of speculation.[4] More to the point, the mere fact that the defendants could have voluntarily adopted a plan commensurate with its constitutional obligations neither precludes the Attorney General from bringing suit to insure that result nor acts in any way to deprive this district court of subject matter jurisdiction over such litigation. If subject matter jurisdiction in the district courts turned upon what local school boards can do, or what local school boards promise to do, or even what local school boards in good faith intend to do, it

(b) To provide and furnish public schools and common schools equally open to all and prohibited and denied to none because of race, creed, color or national origin;

(c) To reaffirm the principles of our bill of rights, civil rights and our constitution;

(d) To provide for the state of Indiana and its citizens a uniform democratic system of public and common school education;

(e) To abolish, eliminate and prohibit segregated and separate schools or school districts on the basis of race, creed or color; and

(f) To eliminate and prohibit segregation, separation and discrimination on the basis of race, color or creed in the public kindergartens, common schools, public schools, vocational schools, colleges and universities of the state. I.C. § 20–8.1–2–1.

4. Clearly, the Department of Justice did not think so; if it had, it presumably would have not commenced the litigation. In this regard, it is noteworthy that the Plan of Desegregation adopted by the Board of Trustees on February 27, 1981, was the first comprehensive plan of its nature ever adopted for the benefit of students attending the schools within the defendant corporation. The filing of the Plan of Desegregation came 27 years after *Brown v. Board of Education,* during which period two generations of students passed through the school system.

is quite likely that as a nation we would have been even more delinquent in effecting the mandate of *Brown v. Board of Education* than we have been.[5] It was for this very reason that by the late 1960's the Supreme Court found it necessary to reiterate the imperative that desegregation be effected with "all deliberate speed" and to remind litigants in school desegregation cases that "the obligation of every school district is to terminate dual school systems *at once* and to operate now and hereafter only unitary schools" *Alexander v. Holmes County Board of Education*, 396 U.S. 19, 20, 90 S.Ct. 29, 29, 24 L.Ed.2d 19, 21 (1969) (emphasis added); *Green v. County School Board of New Kent County*, 391 U.S. 430, 438–39, 442, 88 S.Ct. 1689, 1694, 1696, 20 L.Ed.2d 716, 723, 724, 726 (1968); *Griffin v. School Board*, 377 U.S. 218, 234, 84 S.Ct. 1226, 1234, 12 L.Ed.2d 256, 267 (1964).

This Court has and will continue to have subject matter jurisdiction over this school desegregation case.

## II.

On March 3, 1981, the NAACP filed a Motion to Intervene which, it said was for the purpose of enabling it "to be heard on the submission of the defendants and the United States." By its application, the NAACP contends that it has a right to intervene pursuant to Rule 24(a)(2), F.R. C.P., and alternatively, that the court should grant it permission to intervene pursuant to Rule 24(b)(2), F.R.C.P.[6] The defendants oppose the Motion to Intervene of the NAACP on grounds (1) that the NAACP, as an intervening plaintiff, is adequately represented by the Attorney General, and (2) that its application is untimely.

This Court is bound by the standard set by the Seventh Circuit Court of Appeals to measure the adequacy of representation in school desegregation cases in *United States v. Board of School Commissioners of the City of Indianapolis*, 466 F.2d 573 (7th Cir. 1972). See *United States v. Board of Education of the City of Chicago, supra; United States v. American Institute of Real Estate Appraisers*, 442 F.Supp. 1072, 1081 (N.D.Ill.1977), appeal dismissed, 590 F.2d 242 (7th Cir. 1978). That standard is as follows:

> [R]epresentation is adequate if no collusion is shown between the representative and an opposing party, if the representative does not have or represent an interest adverse to the proposed intervenor and if the necessary representative does not fail in the fulfillment of his duty. 466 F.2d at 575.

The NAACP, as the applicant for intervention, bears the burden of establishing inadequacy of representation. *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 636 n. 10, 30 L.Ed.2d 686, 694 n. 10 (1972). In this Circuit, the standard set forth in the *Indianapolis* case "echoes the strict requirement of a 'very compelling showing' that representation of the public interest by the United States is not adequate" in school desegregation cases. *United States v. Board of Education of the City of Chicago, supra;* 7A *Wright & Miller: Federal Practice and Procedure*, 528 (§ 1909).

As in the *Chicago* case, the NAACP has failed to make any showing of inadequacy of representation of its interests by

---

5. See *Wilkinson, From Brown to Bakke, the Supreme Court and School Integration*: 1954–1978, Chapters 4–5 (Oxford University Press 1979).

6. The criteria for intervention as a matter of right and by permission of the Court have been set forth in previous briefs filed by the parties. See, *Defendants' Memorandum in Opposition to the Motion to Intervene as a Defendant*, pp. 2–3; *Response of the United States to Defendant-Applicant's Motion to Intervene*, pp. 5, 11; *Applicants' [NAACP] Brief in Support of Their Motion to Intervene*, pp. 3, 14. It remains only to be noted that the requirements of intervention as a matter of right under Rule 24(b)(2) must be applied with even greater scrutiny when determining the propriety of permissive intervention under Rule 24(b)(2). *EEOC v. United Airlines*, 515 F.2d 946, 949 (7th Cir. 1975); *United States v. Board of Education of the City of Chicago, supra.* In addition, the rule governing permissive intervention requires the Court, when exercising its discretion, to "consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."

the Justice Department. Certainly there has been no showing of collusion between the original parties. So also, there has not been a showing that the Justice Department has or represents an interest adverse to the NAACP. In this connection, the NAACP itself has asserted that it and the United States have a similar goal: "the systemwide desegregation of students and staff as called for in the consent decree". *Applicant's [NAACP] Brief in Support of Their Motion to Intervene*, p. 6. Finally, the NAACP has failed to show that counsel for the plaintiff has failed to vigorously and effectively fulfill his duty as an advocate in the litigation.

The NAACP argues that the "predicate for a finding for inadequacy of representation 'need not be great in order to satisfy the burden of the applicants,' " citing *Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Commission*, 578 F.2d 1341, 1346 (10th Cir. 1978). Interestingly enough, the same type of argument was tendered by the NAACP in the *Chicago* desegregation case. There, the district court disposed of it as follows:

> ... [The NAACP argues] for a lower threshold for intervention, on the claimed authority of the statement in *Trbovich v. United Mine Workers* ... to the effect that the "burden of making a showing [of inadequate representation] should be minimal." But it cannot be presumed ... that our Court of Appeals was unaware of or failed to consider the *Trbovich* decision, handed down several months before its own decision in *Indianapolis*. *Trbovich* can readily be reconciled with *Indianapolis* by limiting its expression to the specialized circumstances involved there, where federal jurisdiction was exclusive and private actions were barred by law. [Citations omitted.] In that sense *Trbovich* would not be regarded as creating a new test for the general application of Rule 24(a)(2) to cases like *Indianapolis* or this one.

But even a broader reading of *Trbovich*, as stating a new and lower hurdle for intervention generally, does not require the granting of intervention here. Even courts that have given *Trbovich* such broad applicability have continued to hold intervenors have the burden of overcoming a presumption of adequate representation that arises when they have the same ultimate objectives as a party to the existing suit. *United States Postal Service v. Brennan*, 579 F.2d 188, 191 (2nd Cir. 1978). And that presumption is especially appropriate when the party to the existing suit "is a governmental body or officer charged by law with representing the interests of the absentee." *Commonwealth of Pennsylvania v. Rizzo*, 530 F.2d 501, 505 (3rd Cir. 1976). In this case there is no plausible showing of divergence of interests between the United States and the applicants. Thus *Trbovich* does not alter the result compelled by *Indianapolis*. *United States v. Board of Education of the City of Chicago*, 88 F.R.D. 686.

▮ As *Chicago* makes clear, should the NAACP attempt to make a showing that the Department of Justice has failed to adequately represent its interests, it will be met with a strong presumption to the contrary. A presumption of adequate representation arises when the party to the existing suit "is a governmental body or officer charged by law with representing interests of the absentee." *Commonwealth of Pennsylvania v. Rizzo*, 530 F.2d 501, 505 (3d Cir. 1976). In *Moore v. Tangipahoa Parish School Board*, 298 F.Supp. 288, 292, n. 10 (E.D.La.1969), the court said, addressing this problem:

> When intervenors claim they are not being adequately represented by the Government, courts should be very hesitant to hold such representation inadequate, "at least in the absence of any claim of bad faith or malfeasance on the part of the Government ..." *Sam Fox Publishing Co. v. United States*, 366 U.S. 683, 689, 81 S.Ct. 1309, 1313, 6 L.Ed.2d 604 (1961).

Similarly, in *Blocker v. Board of Education of Manhasset*, 229 F.Supp. 714, 715 (E.D.N.Y.1964), it was held that, "[r]epresentation by the governmental authorities is considered adequate in the absence of

gross negligence or bad faith on their part," (quoting 4 *Moore, Federal Practice* ¶ 24.08, at 43 (2d Ed.1963)). Simply put, neither malfeasance nor gross negligence nor bad faith is part of this case. The NAACP has not so argued. Therefore, in light of the foregoing, the NAACP has failed to carry its burden in regard to inadequacy of representation so this Court need not address the further consideration of timeliness and the motion to intervene is hereby DENIED.

## III.

■ On February 26, 1981, Clay Quality Education II, Inc. (Clay) filed an application for intervention without supporting memorandum, a proposed answer and cross claim of intervening defendant and a motion to vacate the consent order of February 8, 1980. Clay holds itself out as a corporation whose members are parents of children in the South Bend Community School Corporation and seeks to intervene on behalf of students who are children of its members and on behalf of all other students in the school system. It should be noted that Clay, as an entity, bears a striking resemblance to the corporation known as "Citizens of Indianapolis for Quality Schools" which sought to intervene in the Indianapolis desegregation case.[7] In Indianapolis, Judge Dillin denied the application of CIQS. The basis for that denial was summarized and adopted in *United States v. American Institute of Real Estate Appraisers, supra,* 442 F.Supp. at 1081:

> In *United States v. Board of School Commissioners of Indianapolis,* 466 F.2d 573 (7th Cir. 1972), the court of appeals affirmed a district court's denial of a petition to intervene in a school desegregation case by a corporation, Citizens of Indianapolis for Quality Schools ("CIQS") and a number of students. CIQS sought to challenge the entry of a consent decree and stipulations between the government

and the school board. The court conceded that requirements of interest and impairment had been met, but found the proposed intervenors had not demonstrated that their interest was inadequately represented by the school board .... The proposed intervenors' claims that the school board, by entering into the consent decree and stipulations, had "failed to assert [the proposed intervenors'] interest as vigorously and effectively as [they] would have had they been parties to the litigation" were insufficient to establish inadequacy of representation.

Judge Dillin's denial of CIQS' application to intervene was based upon *Hobson v. Hansen,* 269 F.Supp. 401 (D.C.C.1967), and *Blocker v. Board of Education of Manhasset, supra.* The defendants in this case urge the Court to adopt the same result.

Clay also seeks to intervene, at least in part, because it apparently feels the defendants had a legal obligation to pose maximum resistance to the complaint and, if it must, to adopt a plan providing only the most minimal degree of mandatory integration.

The defendant School Board simply has no such obligation. While the issue before this Court is whether or not the plan of desegregation meets constitutional standards, it is clear that under Indiana law the defendants are not only given authority but encouraged to integrate to the fullest extent "reasonable, feasible and practical", irrespective of the causes of segregation in the public schools.

The Board of Trustees of the South Bend Community School Corporation has every right to adopt a plan of desegregation which not only meets but surpasses minimal constitutional standards. The only restriction on such affirmative action is the standard set under Indiana law that it be "rea-

---

**7.** See: *Marsh, The Indianapolis Experience: The Anatomy of a Desegregation Case,* 9 Ind.L. Rev. 897–993 (1976). Concerning the Indianapolis organization, Professor Marsh said in part:

> Active parent-teacher association support of teachers scheduled for transfer from Northwest High School, a predominantly white school, evolved into an organization called

Citizens of Indianapolis for Quality Schools, Inc. (CIQS), a conservative white organization. CIQS intervened in the case as a party defendant, aligning itself with the Indianapolis Public Schools, because its members believed that IPS was not forceful enough in resisting the efforts of the Justice Department. 9 Ind.L.Rev. at 911.

sonable, feasible, and practical." I.C., § 20–8.1–2–3. If the defendants have violated that limitation placed upon its powers by the Indiana Legislature, then Clay has redress in the state courts.

Thirdly, Clay's claim to intervene in order to sue the defendants for "the dismantling of a neighborhood school system" provides no legal or logical basis for intervention. The defendants have already pointed out that there is no such right, under the Constitution or otherwise, to attend a "neighborhood school." Concerning the substance of this position, the Fifth Circuit stated in *United States v. Perry County Board of Education*, 567 F.2d 277, 279 (5th Cir. 1978):

> In the context of public school desegregation, there are innumerable instances in which children, parents, and teachers may be deprived of various "rights" (e. g., the "right" to attend a neighborhood school) without having had the opportunity to participate directly in the judicial proceedings which divest them of those "rights". When these adversely affected groups have sought to intervene, we have frequently declined to permit it. *St. Helena Parish School Board v. Hall*, 287 F.2d 376 (5th Cir. 1960), cert. denied 368 U.S. 830, 82 S.Ct. 52, 7 L.Ed.2d 33 (1961); *Horton v. Lawrence County Board of Education*, 425 F.2d 735 (5th Cir. 1970); *Bennett v. Madison County Board of Education*, 437 F.2d 554 (5th Cir. 1970).

Clay's Motion to Intervene is therefore DENIED.

## IV.

■ The consent decree and resulting desegregation plan are the result of long negotiations. The Supreme Court of the United States has recently addressed the topic of consent decrees stating:

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. *Carson v. American Brands, Inc.*, —— U.S. ——, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981), citing *United States v. Armour & Co.*, 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971).

Settlement agreements may thus be predicated on an express or implied condition that the parties would, by their agreement, be able to avoid the costs and uncertainties of litigation.

In this posture the role of the court, empowered as it is under Article III of the Constitution of the United States, is very limited. This Court is not here to act as a super school board nor is it here to decide what the best or most desirable plan of desegregation may be. Rather, this Court's duty is only to determine whether the plan submitted conforms to the consent decree entered into by the parties and whether it is compatible with the Constitution of the United States in light of the Supreme Court's pronouncement in *Brown v. Board of Education, supra*, and its progeny. That mandate is too clear to be ignored.

This plan will affect approximately 25,500 students of which approximately 23 per cent are black. The total transportation before redistricting involved 9,860 students with a ratio of 9 to 1, white to black. Under that arrangement approximately 39 per cent of the student population was involved in transportation. The total transportation under this plan will involve 13,950 students with a ratio of 1.5 to 1 white to black. Under this plan approximately 55 per cent of the student population will be involved in transportation. The plan also requires that the percentage of black students in each high school, middle school, and regular elementary school be within 15 percentage points of the total percentage of black students who attend all the schools in the corporation. The proposed plan provides that 16 out of the principal 27 schools in the system will have minority populations within plus or minus 3 percentage points of the actual minority population. Further, eight of the remaining schools will

have minority populations within plus or minus 6 percentage points of minority population. Thus 89 per cent of the schools, or 24 out of 27 schools, will be within plus or minus 6 per cent of the actual minority population of 23 per cent black. Finally, only three schools, Tarkington, Kennedy, and Harrison, are beyond the plus or minus 6 per cent range of the 23 per cent actual minority population. No racial projections are currently available for the five planned alternative elementary schools, however, these schools must and shall be operated within the range of racial composition permitted by the consent order.

This plan is well within the Constitution of the United States and conforms with the agreement entered into by the parties. Also, this plan is well within the state statutory authority of the defendant school board. This Court does not here decide that the defendant school board was required to adopt a plan of this scope. It may not have been so required but the Board determined that such a plan was necessary and perhaps desirable. Most of the day to day details of the implementation of this plan are left to the administrators of the South Bend Community School Corporation.

For the foregoing reasons, the Court approves the Consent Order submitted on April 3, 1981 and amends it hereto. SO ORDERED.

## CONSENT ORDER

On February 8, 1980, the United States filed this action seeking the desegregation of the South Bend Community School Corporation. On the same day, the United States and the School Corporation and other named defendants submitted to the court a proposed consent order which after review by this court was entered on February 8, 1980. Under that order, the defendant School Corporation denied any constitutional violation but stated that it was committed to a policy of effectively integrating the school system. The parties agreed that it was in their best interests and in the best interests of the students of the community to resolve this issue without contested litigation by establishing an orderly procedure for the development and implementation of

an appropriate desegregation plan. The February 8, 1980, consent decree, therefore, required the School Corporation to develop a specific plan of student assignment for implementation by the beginning of the 1981–82 school year which would provide that the percentage of black students in each school would be within fifteen percentage points of the total percentage of black students in the School Corporation and which would ensure that any student transportation or school closings associated with desegregation would fall equitably on all racial groups.

The Board of School Trustees of the School Corporation has adopted a desegregation plan for implementation at the beginning of the 1981–82 school year which is attached hereto as Exhibit I and incorporated herein by reference. This plan revises attendance zones, changes the grade structures of some schools, closes some schools, and converts some schools to alternative educational approaches. The projected enrollments by race for the regular school programs indicate that each such school will be within the range of racial composition permitted by the February 8, 1980 consent order. No racial projections are presently available for the five planned alternative elementary schools. These schools, however, shall be operated with racial compositions which conform to the prior consent order. The desegregation plan also contains projections of the number of students, by race, who will be transported under the plan.

The Board of School Trustees adopted this desegregation plan after conducting numerous, lengthy public meetings. At these meetings the Board considered an initial proposed plan developed by the school district administration, other plans developed by the school administration at the Board's request, and possible desegregation plans proposed by members of the public. The Board of School Trustees believes that the plan submitted herewith best provides for the stable integration of the school system. The Board asserts that the plan is educationally sound and administratively feasible, and that the school closings and

transportation proposed under the plan do not place an inequitable burden on any one racial group.

The United States asserts, based on the projected student enrollments and the projected student transportation set forth in the plan and the representations of the defendants, that the plan complies with the requirements of the consent order of February 8, 1980. The United States further believes that the plan is educationally sound and administratively feasible and that adoption of the plan by the court would be in the interests of justice.

In light of these considerations, the parties, as indicated by the signature of their counsel below, request that the court adopt the desegregation plan submitted by the South Bend Community School Corporation and order its implementation by the beginning of the 1981–82 school year. All parties waive the entry of findings of fact and conclusions of law.

WHEREFORE, the parties having freely given their consent, the terms of the order being within the scope of the complaint and the provisions of the consent order of February 8, 1980, and the terms of the order not being unlawful, unreasonable, or inequitable, it is hereby ORDERED, ADJUDGED, and DECREED that:

1. The defendants shall implement by the beginning of the 1981–82 school year the desegregation plan adopted by the Board of School Trustees and attached hereto as Exhibit I and incorporated herein by reference. The defendants and their successors in office shall continue to operate the South Bend Community School Corporation in conformity with this plan until further order of the court.

2. The defendants shall follow the procedures for placement of students in the alternative schools set forth on Exhibit "II" to this order.

3. Whitney Young alternative high school is exempted from the requirement set forth in paragraph 2 of the consent order of this court dated February 8, 1980 that the percentage of black students in that school must be within fifteen percentage points of the total percentage of black students in the school corporation. Provided, however, referrals to Whitney Young alternative high school shall be closely monitored by the defendant and shall not be made in a racially discriminatory manner.

4. Kindergarten students shall be exempt from mandatory reassignment under the Desegregation Plan for Student Assignment adopted above in Paragraph 1 and set forth herein as Exhibit I. The defendants shall provide free transportation, however, to those students who wish to attend kindergarten at the school to which they will be assigned for the first grade under the Desegregation Plan.

5. For the 1981–1982 school year only, the defendants may afford students who will be enrolled in the twelfth grade and who would be reassigned under the Desegregation Plan for the 1981–1982 school year the option of attending either the high school they attended during the 1980–1981 school year or the high school to which they are assigned under the Desegregation Plan.

6. In carrying out the integration of faculties of each school operated by the defendants pursuant to paragraph 6 of the consent order of this court dated February 8, 1980, defendants shall maintain faculties in each elementary school in the system having a racial composition within five percentage points of the total percentage of black faculty members in all elementary schools in the system and shall maintain faculties in each middle and high school in the system having a minority racial composition within five percentage points of the total minority racial composition of faculty members in all middle and high schools in the system. These same percentage ranges shall be maintained for the 1981–1982 school year pursuant to the faculty reassignments provided for in Paragraph 5 of the Desegregation Plan for Student Assignment.

7. All prior orders of the court in this action to the extent not inconsistent with this order shall remain in full force and effect.

8. The court shall retain jurisdiction of this action for all purposes.

APPENDIX

EXHIBIT II

SOUTH BEND COMMUNITY SCHOOL CORPORATION ALTERNATIVE SCHOOL PLACEMENT PROCEDURES

Applications for enrollment in the alternative schools operated by South Bend Community School Corporation will be handled according to the following procedures:

1. Advertisements will be placed in newspapers and in several other ways applications will be solicited for students to attend these schools.

2. As applications are received in the Elementary Education Office of the school corporation, they will be dated and sorted according to race and high school feeder area in which the student resides.

3. Each high school feeder area will be handled independently.

4. Applications will be considered in the order in which they are received at the elementary education office and will be checked for their impact on the racial composition of the alternative school and sending school in two ways:

(a) The racial balance of the alternative school will be checked to see if the addition of the child being considered will cause the school to be out of compliance.

(b) The "sending" traditional school for that child will be checked to see if the child's assignment from that school to the alternative school will cause the "sending" school to fall out of compliance with the required racial composition percentages.

5. If either the "sending" school or the alternative school would be taken out of compliance with the required percentage standard of racial composition as established by the federal court, the application will be put on a waiting list and will be considered later as more applications are received so that the alternative school and the sending school will both remain in compliance with the necessary percentages of racial composition.