Beryl N. JONES, et al., Plaintiffs,

v.

CADDO PARISH SCHOOL BOARD, et
al., Defendants-Appellees,

v.

June PHILLIPS, Movant-Appellant.

No. 81–3439.

United States Court of Appeals,
Fifth Circuit.

May 6, 1983.

Troy E. Bain, Shreveport, La., for movant-appellant.

Beard, Arceneaux & Sutherland, Fred H. Sutherland, Shreveport, La., Wm. Yeomans, Alexandria, Va., for defendants-appellees.

Before GOLDBERG, WILLIAMS and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

June Phillips appeals from a denial of her motion to intervene, both individually and on behalf of a class, in this litigation concerning the desegregation of the Caddo Parish school system. We agree with the district court that Ms. Phillips' motion failed to satisfy a prerequisite for intervention under Fed.R.Civ.P. 24; accordingly, we affirm the denial of her petition.

## PROCEDURAL HISTORY

This action began in 1965 when seven black school children and their parents filed a complaint alleging that the Caddo Parish public schools were operated on a biracial basis, in violation of the rights secured to them under the equal protection clause of the fourteenth amendment. Plaintiffs sought to represent themselves and a class of "Negro children and their parents in Caddo Parish," pursuant to Rule 23(a)(3) of the Federal Rules of Civil Procedure as then in effect (the 1938 version).[1] The district court, per Judge Dawkins, enjoined the operation of the dual school system and ordered the Caddo Parish School Board to prepare a desegregation plan. Following the submission of the School Board's proposal, the United States moved to intervene as a party plaintiff pursuant to Title IX of the 1964 Civil Rights Act, 42 U.S.C. § 2000h–2.[2] The district court adopted the School Board's desegregation scheme and denied intervention by the United States; both of these actions were reversed by our decision in *United States v. Jefferson County Board of Education,* 372 F.2d 836 (5th Cir.1966), *aff'd with modifications,* 380 F.2d 385 (5th Cir.) (*en banc*), *cert. denied,* 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed.2d 104 (1967). The United States has been an active participant in this litigation since the decision in *Jefferson County.*

Subsequent desegregation plans adopted in Caddo Parish were disapproved by this Court in *Hall v. St. Helena Parish School Board,* 417 F.2d 801 (5th Cir.), *cert. denied,* 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969) (rejecting a freedom of choice plan), and *Jones v. Caddo Parish School Board,* 421 F.2d 313 (5th Cir.1970) (reversing the district court's approval of a plan submitted by the School Board and remanding for consideration of *Singleton v. Jackson Municipal Separate School District,* 419 F.2d 1211 (5th Cir.1969) (*en banc*), *cert. denied,* 396 U.S. 1032, 90 S.Ct. 611, 24 L.Ed.2d 698 (1970)).

In February 1972, plaintiffs filed a petition for further relief which requested the elimination of racially identifiable schools and professional staffs, and a judgment declaring the apportionment scheme for School Board elections to be unconstitutional. The petition was signed by Arthur Thompson of the law firm of Stone & Thompson. Nine days later, an amended motion for further relief was filed. This motion, after acknowledging the prior request, focused on the School Board's failure to dismantle "schools with substantially disproportionate racial compositions" and sought the elimination of the remaining vestiges of the dual school system. The attorney who signed the amended motion was Margrett Ford. In previous filings Ms. Ford had been listed in association with Jack Greenberg and Norman Chachkin of the NAACP Legal Defense Fund in New York City; however, she had recently notified the district court of her new address in Shreveport, Louisiana. While these motions were pending, Judge Dawkins recused himself from the case and Judge Scott took the helm.

---

1. Former Rule 23(a) provided:

 "(a) Representation. If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is (1) joint, or common, or secondary in the sense that the owner of a primary right refuses to enforce that right and a member of the class thereby becomes entitled to enforce it; (2) several, and the object of the action is the adjudication of claims which do or may affect specific property involved in the action; or (3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought."

2. 42 U.S.C. § 2000h–2 provides:

 "Whenever an action has been commenced in any court of the United States seeking relief from the denial of equal protection of the laws under the fourteenth amendment to the Constitution on account of race, color, religion, sex or national origin, the Attorney General for or in the name of the United States may intervene in such action upon timely application if the Attorney General certifies that the case is of general public importance. In such action the United States shall be entitled to the same relief as if it had instituted the action."

In March 1973, the United States responded to the motions for relief by requesting that the court appoint a biracial committee of citizens of Caddo Parish (the "Committee") to assess the progress of the existing desegregation scheme and to develop alternate proposals. Judge Scott ordered the establishment of such Committee, which presented its report and desegregation plan on June 1, 1973. Shortly thereafter, plaintiffs—through Margrett Ford—filed their objections to the pupil assignment portion of the Committee's proposed method of desegregation. Ms. Ford also moved to add additional parties as plaintiffs. The United States objected to the Committee plan because it permitted the continued operation of thirty-four one-race or predominately one-race schools.

Prior to the disposition of these objections, Jesse Stone (of Stone & Thompson), plaintiffs' original retained counsel, moved to strike Arthur Thompson, Margrett Ford, Jack Greenberg, and Norman Chachkin as counsel for plaintiffs and to substitute in their place Murphy Bell. Attached to this motion was the affidavit of Reverend E. Edward Jones, one of the original named plaintiffs in the action, stating that Arthur Thompson had been elected to the Caddo Parish School Board and, hence, must withdraw as plaintiffs' representative, and that the lawyers from the NAACP Legal Defense Fund were being dismissed "because of the objections [they] filed to the Court Appointed Citizens Committee Desegregation Plan."[3] The motion to substitute

counsel was signed by Judge Scott on July 13, 1973. A few days later, Judge Scott denied the motion to add additional party plaintiffs.[4] Newly appointed plaintiffs' counsel, Mr. Bell, then filed a motion seeking to strike the objections to the Committee's desegregation plan that had previously been lodged by Ms. Ford.[5] The objections were deleted by an order of the district court dated July 20, 1973. That same day, the court adopted the Committee's desegregation plan and directed that it be implemented in time for the start of the 1973–74 school year.

Four months later, lawyers Greenberg, Chachkin, and Ford filed a motion to intervene on behalf of several black school children and their parents who resided in Caddo Parish.[6] The application for intervention stated that the named individuals sought to represent a "class of present and future black public school children who are or will be eligible to attend the public schools of Caddo Parish." Appended to the application for intervention was the complaint of plaintiffs-intervenors, which assailed the constitutionality of the Committee's pupil assignment plan for its retention of one-race schools within the parish. Finding that the original plaintiffs adequately represented the class and that the motion to intervene was untimely, the district court denied the application for intervention. That decision was vacated by this Court and remanded for an evidentiary hearing on the motion to intervene. *Jones v. Caddo Parish School Board*, 499 F.2d 914 (5th Cir.1974).

---

**3.** The affidavit of Reverend Jones also stated that telegrams had been sent to Ford, Greenberg, and Chachkin informing them of their dismissal and the reasons therefor. The telegrams were signed by Reverend Jones and two other parents of children named as plaintiffs in this suit.

**4.** The order itself is based, in part, on the failure of Ms. Ford to secure the signatures of all counsel representing plaintiffs. Detecting a lack of uniform direction on the part of the plaintiffs' attorneys, Judge Scott stated:
 "The motion is signed only by Margrett Ford and should not be considered unless joined in by other counsel for plaintiffs at the time of its filing, namely Jack Greenberg and Norman Chachkin, ... and particularly

plaintiffs' local counsel at the time of the filing of the motion, namely Jesse N. Stone, Jr. and Arthur Thompson.... Adequate and proper representation of plaintiffs cannot be assured by divided counsel."

**5.** Paragraph 5 of this motion indicated that plaintiffs approved of the Committee plan and that, "if implemented in toto, [it] will provide a unitary school system in Caddo Parish ...."

**6.** Also signing this motion as counsel for the applicants for intervention were James Nabrit, III and Hilry Huckaby, III. The parties named as plaintiffs are the same as those named in the previous motion to add party plaintiffs filed by Ms. Ford.

On remand, the district court was instructed to "determine the class and who properly represents it." *Id.* at 917. However, the record reflects no further development on the application for intervention; on remand, no hearing was sought or held.

For approximately the next two years, the Caddo Parish school system operated under the Committee's desegregation plan without further legal proceedings. On July 20, 1976, the Citizens Advisory Committee, a group appointed to oversee the implementation of the 1973 plan, filed a report with the district court indicating several areas in which the parish had not met the requirements established by the plan. That report recommended a one-year extension of the court order directing compliance with the 1973 Committee desegregation scheme. After examining data on the system's progress submitted by the School Board, Judge Scott appointed a Special Master "for the specific purpose of investigating, examining and producing evidence to enable the Court to determine the degree of conformity achieved by the Caddo Parish School Board in satisfying the conditions and provisions of the [1973] plan ...."

In September 1976, the School Board filed a motion with the district court asking for a declaration that the Caddo Parish school system was unitary and for dismissal of this action. Opposing this motion, the United States stated that any declaration of unitary status prior to the completion of the Special Master's duties would be premature. Deposition testimony was taken before the Special Master on November 8 and 9, 1976. The plaintiffs—through counsel William Jefferson—also filed a memorandum in opposition to the School Board's motion.[7] On December 30, 1977, Judge Scott found that the "former state-imposed dual system has been completely eradicated" and declared the Caddo Parish school system "a unitary system." The judgment rendered that day dismissed the suit.

Neither the United States nor the private plaintiffs appealed from this decision, but on January 11, 1978, the government moved to amend the district court's judgment and findings, claiming procedural irregularities in the proceedings held by the Special Master and substantive deficiencies in the determination that a unitary status had been achieved. Significantly, none of the original plaintiffs indicated any opposition to the finding that the system was unitary or to the dismissal of the action. In July 1978, the School Board requested that the district court lift the requirement of a faculty ratio of 50 percent white and 50 percent black.[8] Again, only the United States filed in opposition to the School Board's request for partial relief.

On August 16, 1979, Judge Scott recused himself and the case was transferred to its third district judge, Judge Stagg.

On June 3, 1980, following a status conference held the previous day, Judge Stagg entered a minute order which provided in part:

"If the original plaintiffs still have a viable interest in this case, their counsel should contact the court, in writing, within thirty (30) days of this order. If the plaintiffs' counsel does not respond, this court will consider that the plaintiffs acquiesce in having their interests represented by the United States as plaintiff-intervenor."

Copies of this notice were mailed to all past and present attorneys of record, including Jesse Stone, Margrett Ford, Murphy Bell, and William Jefferson. While responses were received, in one form or another, from several former plaintiffs' representatives, none came forward to indicate a viable interest in the case or to object to proceeding

---

7. The reasons for Mr. Jefferson appearing on behalf of the plaintiffs is unclear. On September 15, 1976, he filed a notice of appearance as counsel and four months later he was the signatory counsel on the above memorandum. Plaintiffs' other counsel, Murphy Bell, does not appear on this document.

8. Subsequent to the government's motion to amend the judgment, the district court notified the School Board that the school system would continue to operate under the 1973 Committee desegregation plan until such time as the court could assess the government's objections.

with the United States as plaintiff-intervenor.[9]

At this point, the United States and the Caddo Parish School Board entered into negotiations in an attempt to arrive at a settlement. At no point in the course of these negotiations, which lasted for almost a year, did any of the plaintiffs or their counsel attempt to participate. In February, March, and April 1981, numerous public meetings were held throughout the community to inform the citizens about various desegregation approaches and to obtain community input.[10] Representatives of the Justice Department met with numerous black civic leaders and received input from black citizen and parent groups. The negotiation process culminated on May 5, 1981, with the signing of a settlement agreement between the United States and the School Board. Two days later, pursuant to a joint motion of the parties, the district court entered a consent degree which embodied that agreement.

Judge Stagg's order approving the consent decree directed the clerk of the court to provide for public notice of the terms of the decree. The consent decree was published in its entirety in both local newspapers and was covered by the three local television stations. The district court also set aside a ten-day period in which "interested parties" could file written objections to the decree. Within the specified time period, the court received thirteen objections, one of which was filed by June Phillips, appellant herein. The objection Ms. Phillips raised was confined to the failure of the decree to provide "enrichment programs" for black students at many of the district's elementary schools.

On May 22, 1981, four days after the period for filing objections had expired, Ms. Phillips filed a motion to intervene individually and on behalf of a class of black children in the Caddo Parish school system and their parents. Her petition alleged numerous deficiencies in the pupil assignment plan contained in the consent decree and requested the district court to set aside the decree. On May 27, Ms. Phillips filed a first supplemental motion to intervene. On June 8, she filed her second supplemental motion to intervene. That same day the United States and the School Board separately filed responses to the objections to the consent decree, and memoranda opposing Ms. Phillips' attempt to intervene.

On June 17, 1981, the district court entered a memorandum ruling denying Ms. Phillips' motion to intervene. Judge Stagg found her proposed intervention both untimely and without new issues that had not previously been considered by the School Board and the United States. On July 2, the district court overruled all objections to the consent decree. Ms. Phillips appeals from the denial of her intervention and the rejection of her objection to the consent decree.

## A PRELIMINARY ISSUE: THE PARTIES TO THE CONSENT DECREE

According to the district court, Ms. Phillips sought intervenor status both individually and as a representative of a class for the purpose of setting aside a consent decree negotiated by and agreed upon by only two parties, the United States and the Caddo Parish School Board. In its memorandum ruling denying Ms. Phillips' interven-

---

9. Jesse Stone, one of plaintiffs' original retained counsel, contacted the court by letter to indicate that he had withdrawn as counsel "many months ago." The case file also contains an application for withdrawal of the record in this case made by Arthur Thompson, of Shreveport, Louisiana, also one of plaintiffs' original retained counsel, on June 9, 1980. There is, however, no indication that Mr. Thompson then or thereafter took any action on behalf of the plaintiffs. Finally, the case file contains a letter, dated July 30, 1980, from Jack

Greenberg to Judge Stagg. In that document, Mr. Greenberg refers to a previous letter he had sent to Judge Stagg (on July 3, 1980) representing that he was counsel for plaintiffs in this action. The letter of July 30 states that the previous representation was erroneous and that plaintiffs' counsel is Arthur Thompson; a copy of the letter to Arthur Thompson is shown.

10. Some twenty-eight such meetings are listed in the papers filed by the School Board below.

tion, the court found that "this action, in its present posture, is not in fact a class action."[11] The court reasoned that the action brought by the private plaintiffs, despite allegations of a "class" status, had never been certified as a class action, that prior to June 1980 the original plaintiffs had not taken an "active role in this litigation for some time," and that none of these plaintiffs or their counsel responded within the prescribed time period to the minute entry of June 3, 1980. The uncertain nature of the private plaintiffs' role in the later years of this litigation, highlighted by a complete failure to reestablish their participation through the order of June 3, resulted in a dismissal of the claims of the class members. Therefore, the settlement negotiations and the resulting consent decree were the efforts of two parties, the School Board on one side and the United States—pursuant to 42 U.S.C. § 2000h–2—on the other.

The district court correctly viewed this action as one involving only two parties, and not as a class action, after July 3, 1980.[12] From the outset of this litigation, the status of the private plaintiffs as representatives of a class was uncertain. Although the original complaint contained allegations made on behalf of a class pursuant to former Rule 23(a)(3), it was just over

a year later that Rule 23 was amended to include a mandatory requirement of class certification.[13] Rule 23(c)(1), effective July 1, 1966, provided that "[a]s soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained," and the order of the Supreme Court accompanying the 1966 amendments to the Federal Rules of Civil Procedure explained that the amendments

"shall govern all proceedings in actions brought [after July 1, 1966] and also in all further proceedings in actions then pending, except to the extent that in the opinion of the court their application in a particular action then pending would not be feasible or would work injustice, in which event the former procedure applies." 383 U.S. 1031 (1966).

This Court has held amended Rule 23 to apply to actions that were filed before the effective date of the amendments, *Alvarez v. Pan American Life Insurance Company,* 375 F.2d 992, 993 (5th Cir.), *cert. denied,* 389 U.S. 827, 88 S.Ct. 74, 19 L.Ed.2d 82 (1967), and we have stated more generally "that to the maximum extent possible, the amended Rules should be given retroactive application." *Atlantis Development Corporation v. United States,* 379 F.2d 818, 823 (5th Cir.

---

11. The district court's June 17, 1981 memorandum states, ". . . this court agrees with the government's contention that this action, in its present posture, is not in fact a class action. The government has never been designated as a class representative, nor, as Phillips alleges, has it ever 'purported' to represent a class. The government has 'represented' parties in this case only in the sense that it is 'entitled to the same relief as if it had instituted the action' under Title IX of the Civil Rights Act of 1964, 42 U.S.C. § 2000h–2. No class has ever been certified in this action . . . ."

The United States, in its opposition to Ms. Phillips' motion to intervene, filed below, stated, among other things, ". . . the United States has not been designated as a representative of any class herein (nor has it ever purported to represent a class, as petitioner mistakenly claims). This Court's June 3, 1980 order never designated the United States as a class representative."

12. We employ July 3, 1980 as an approximation. The district court's order of June 3 provided the original plaintiffs and their counsel

thirty days in which to acknowledge a continuing interest in the case. Thus, to simplify matters, we add thirty days to June 3 and arrive at July 3 as the approximate date of termination for the private class claims.

13. Former Rule 23(a)(3), the "spurious" class action, required, in addition to the numerosity and adequate representation requirements, the enforcement of a *several* right, a common question of law or fact, and a common relief. The device was frequently described as a mechanism for permissive joinder of parties. *See* 7 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 1752 at 525 n. 85 (1972), and cases cited therein. As a result, many courts held that the judgment in a spurious class action had no effect on the rights of nonappearing parties. *See, e.g., California Apparel Creators v. Wieder of California, Inc.,* 162 F.2d 893, 897 (2d Cir.), *cert. denied,* 332 U.S. 816, 68 S.Ct. 156, 92 L.Ed. 393 (1947); *see also* 3B J. Moore & J. Kennedy, *Moore's Federal Practice* ¶ 23.10[7] (1982).

1967). Despite the general retroactive applicability of the amendments to Rule 23, the record in this case indicates that no class certification in accordance with Rule 23(c)(1) was ever requested or ordered. Thus, the true nature of the class was never judicially ascertained.

A series of actions in the early 1970's further depicted the unsettled nature of the purported class. In 1973, an apparent "split" developed between the interests and goals of the named representatives and those of the lawyers from the NAACP Legal Defense Fund. This divergence of interests ultimately led to the named plaintiffs' withdrawing the NAACP lawyers as counsel and to the withdrawal of objections to the 1973 Committee plan previously filed by one of those lawyers. Yet, contemporaneously, Margrett Ford (one of the NAACP lawyers) moved the district court to add additional parents and children in Caddo Parish as party plaintiffs. In denying this latter motion, the district court took note that Ms. Ford was the only attorney sponsoring the motion, and the judge warned that "[a]dequate and proper representation of plaintiffs cannot be assured by divided counsel."

It became apparent that this "rift" was more than a disagreement among counsel when many of the same school children and their parents who had sought to become additional party plaintiffs filed a motion to intervene in November 1973. The complaint attached to the motion for intervention alleged that the 1973 Committee desegregation plan—not objected to by the original plaintiffs—was unconstitutional because it maintained one-race schools within the parish. Although intervention was denied by the district court, this Court vacated that judgment and expressly directed the district court on remand to "determine the class and who properly represents it." *Jones v. Caddo Parish School Board*, 499 F.2d at 917. The uncertain nature of the class prompted this Court to state:

"Thus we have an unusual contest between black groups represented by different counsel, some of whom were originally associated together when this suit was first filed, and we cannot determine on the record before us who most properly represents the rights of the black community in Caddo Parish." *Id.*

Despite this indication of concern over the undefined group of plaintiffs loosely constituting the "class," class certification, or definition, was not pursued when the case was remanded to the district court.

From the date of our 1974 opinion in *Jones v. Caddo Parish School Board, supra,* until the filing of the objections to the 1981 consent decree—a period of over six years—the black citizens of Caddo Parish were heard from, either through the original named plaintiffs or otherwise, only once.[14] Ms. Phillips acknowledges this in her petition for intervention when she states, "From July 20, 1973 to July 3, 1980, The Class which plaintiff seeks to represent was virtually unrepresented in these proceedings." When Judge Scott entered his order finding the school system unitary, the plaintiffs did not file an appeal or attempt to have that finding amended by the district court. Moreover, they did not join in the government's motion to amend the findings and set aside the declaration of unitary status. Similarly, the plaintiffs did not oppose the School Board's motion for relief from the faculty racial percentage requirements, nor did they join the motion of the United States, which sought to postpone consideration of this issue.

When this case was assigned to Judge Stagg in August 1979, the only plaintiff who had actively participated over the previous two and one-half years was the United States. In June 1980, following a status conference which included a discussion of "the present status of the plaintiffs and their proper representation," the court entered the following minute order, a copy of which was sent to all counsel of record, past and present:

14. That one occasion was a memorandum submitted in January 1977 in opposition to the School Board's motion to declare the system unitary.

"If the original plaintiffs still have a viable interest in this case, their counsel should contact the court, in writing, within thirty (30) days of this order. If the plaintiffs' counsel does not respond, this court will consider that the plaintiffs acquiesce in having their interests represented by the United States as plaintiff-intervenor."

None of the plaintiffs or their counsel expressed an interest in participating in any further proceedings in this action. In addition, no objections were lodged to proceeding with the United States as plaintiff-intervenor.

The failure of the plaintiffs and their counsel to affirmatively assert an interest in this action within the prescribed time period, combined with the uncertainty surrounding the "class" aspect of the suit over the preceding six years and the lack of any class certification, warranted the district court's dismissal of the claims of the class for failure to prosecute. It is well-recognized that a district court has inherent power to order, *sua sponte,* the dismissal of an action for want of prosecution. *Link v. Wabash R.R. Co.,* 370 U.S. 626, 630–33, 82 S.Ct. 1386, 1388–1390, 8 L.Ed.2d 734, 737–38 (1962); *Rogers v. Kroger Co.,* 669 F.2d 317, 319–20 (5th Cir.1982); *see* 9 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* §§ 2369–70 (1971). Although infrequent, dismissals for failure to prosecute of suits denominated as class actions are proper in the federal courts. *See Partridge v. St. Louis Joint Stock Land Bank,* 130 F.2d 281 (8th Cir.1942); *National Hairdressers' & Cosmetologists' Ass'n v. Philad Co.,* 4 F.R.D. 106 (D.Del.1944). Here, the record strongly supports the district court's determination that the plaintiffs had lost interest in pursuing this litigation, and that they had no objection to the United States, as plaintiff-intervenor, seeking further desegregation of the parish schools.

On appeal, Ms. Phillips asserts that the district court failed to comply with the requirement of Fed.R.Civ.P. 23(e) that notice of the proposed dismissal of a class action be provided to all members of the class.[15] In the present circumstances, no such notice was required. Rule 23(e) was enacted "to assure that any person whose rights would be affected by a dismissal or compromise has the opportunity to contest the proposed action." 7A C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 1797 at 234 (1972). However, the special prophylactic function of Rule 23(e) is not applicable to all forms of dismissal. For example, when the dismissal is involuntary—as it was here—and it "could not involve collusion or benefit the representative plaintiffs at the expense of the remaining class members, the protection afforded by giving notice to the absentees is not required." *Id.* at 235; *see Laventhall v. General Dynamics Corp.,* 91 F.R.D. 208, 210 (E.D.Mo.1981) (Rule 23(e) does not apply to involuntary dismissal of an uncertified class action). In *Partridge v. St. Louis Joint Stock Land Bank, supra,* the Eighth Circuit affirmed the trial court's dismissal of a class action for failure to prosecute, even though notice of the dismissal was not provided to the nonparty class members. The suit in *Partridge* had been pending on the district court's docket for nine years, with the plaintiffs receiving a long series of continuances. When the court ordered the action set for trial—giving plaintiffs full notice thereof—counsel for the named plaintiff again moved orally for a continuance. The suit was dismissed for failure to prosecute, even though the named party was the representative of a large "class of persons." 130 F.2d at 286. The Eighth Circuit noted that "the court has the duty to see to it that even a class suit shall be prosecuted with due diligence," and concluded that Rule 23(c), the predecessor to current Rule 23(e), was "not applicable to dismissal for failure to prosecute under the circumstances here presented." *Id.*

15. Fed.R.Civ.P. 23(e) provides:
"A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."

While the *Partridge* decision has been criticized for not recognizing that the failure to prosecute may indicate a lack of interest only by the named representatives, *see, e.g.,* 7A C. Wright & A. Miller, *supra,* § 1797 at 236; Comment, *Involuntary Dismissals of Class Actions,* 40 U.Chi.L.Rev. 783, 791–92 (1973), the concerns expressed by the commentators are ameliorated by two factors present here. First, the United States was actively participating in the litigation as a party plaintiff. Thus, even a complete and final dismissal of all private plaintiffs would not mean that school desegregation would no longer be pursued in Caddo Parish. As the district court recognized, 42 U.S.C. § 2000h–2 empowers the United States to intervene and to seek "the same relief as if it had instituted the action." This authorization continues even though the private plaintiffs to the action have been removed, "so long as [the government's] participation serves the statutory purpose."[16] *Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 430, 96 S.Ct. 2697, 2702, 49 L.Ed.2d 599, 605 (1976).

More importantly, we believe that the district court's dismissal of the claims of the private plaintiffs, despite being predicated on a failure to prosecute, was not an adjudication on the merits. Therefore, the failure of the district court to notify all members of the class of the proposed dismissal did not allow the named representatives to sacrifice or unduly compromise the interests of the unnamed class members. While Fed.R.Civ.P. 41(b) presumptively makes an involuntary dismissal for failure to prosecute an adjudication upon the merits, *see Weissinger v. United States,* 423 F.2d 795, 798–99 (5th Cir.1970) (*en banc*), that same rule provides that the district court may direct otherwise in its order of dismissal.[17] Here, however, no formal order of dismissal was filed. Thus, where we are confronted with the dismissal of a class suit without the entry of an order of dismissal, we decline to merely automatically imply the severe penalty of a dismissal with prejudice, and, rather, believe it necessary to examine the circumstances surrounding the termination of the class action, as well as the pertinent orders and rulings of the district court, to determine whether the dismissal was with or without prejudice.[18]

**16.** Ms. Phillips construes the district court's minute entry of June 3, 1980, and 42 U.S.C. § 2000h–2 to establish the United States as the representative of a class similar to that broadly alleged in the plaintiffs' original complaint. This is a misinterpretation of both provisions, and was properly rejected by Judge Stagg, who had entered the June 30 order. *See note 11, supra.* The order of June 3 did not indicate that at the expiration of thirty days the United States would replace the private plaintiffs in the role of class representative; rather, it stated that the plaintiffs would "acquiesce in having their interests represented by the United States as plaintiff-intervenor." This statement suggests that the plaintiffs, should they decide not to come forward and continue the litigation, have no objection to the government continuing to independently pursue the action as plaintiff-intervenor. Moreover, 42 U.S.C. § 2000h–2 has been construed to authorize the United States to intervene as a party plaintiff and to continue in that capacity despite the subsequent removal of the private plaintiffs. *Pasadena City Board of Education v. Spangler, supra.*

**17.** Fed.R.Civ.P. 41(b) provides in part:
"For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against him.... Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits." Although Rule 41(b) is written in terms of a motion for dismissal by the defendant, it is settled that the court may act on its own to dismiss for want of prosecution, *see Link v. Wabash R.R. Co., supra,* and that Rule 41(b) codified that power, although only in part. *See* 9 C. Wright & A. Miller, *supra* § 2370 at 202 n. 92 (1971).

**18.** The absence of an order of dismissal differentiates this case from *Weissinger v. United States, supra.* The district court in *Weissinger,* following the presentation of all the evidence in an action tried to the court, concluded that the government had failed to make a demand on the defendants for payment of two loans, a condition precedent to bringing legal action, and entered an order of dismissal with prejudice. In a second action by the government to recover on the same loans, the district court held that the previous order of dismissal did

The necessity for this inquiry is particularly acute in this situation where, in addition to the above factors, the nature of the class has gone undefined throughout the course of the litigation.

Several factors lead to our conclusion that this dismissal was without prejudice. First, the minute entry of June 3, 1980, did not inform counsel that a failure to respond would result in an adjudication on the merits; to the contrary, the only penalty indicated was that the private parties would accede to the United States pursuing the action as plaintiff-intervenor. Instead of indicating a dismissal prejudicial to the filing of future desegregation actions, this order suggests that the plaintiffs were given thirty days to continue or withdraw from *this* action only. The June 3 order did not even hint that the district court was contemplating permanently removing an ambiguously defined class of private plaintiffs from the filing of further desegregation suits in Caddo Parish. Second, the district court's memorandum ruling denying Ms. Phillips' motion to intervene was similarly devoid of any suggestion that the dismissal of the class suit was with prejudice.

The circumstances surrounding the dismissal of the private plaintiffs also indicate a dismissal without prejudice. The prejudicial dismissal for failure to prosecute of a purported class action, particularly one involving issues of system-wide school desegregation, should only follow an inquiry into the relationship between the class representatives and the unnamed class members.

Here, the class itself was never defined with any particularity, making a determination of the significance of the failure to prosecute problematic at best. In fact, we note that under the former Rule 23(a)(3), the basis for the class allegations in the original complaint, a judgment was binding on only the parties of record. *See* 3B J. Moore & J. Kennedy, *Moore's Federal Practice* ¶ 23.10[7] (1982). Thus, if the class allegations here are treated as having been made pursuant to that Rule, the district court's dismissal would only bind the named parties to this action.

Further, the law in this Circuit in regard to dismissals with prejudice for failure to prosecute has been well-settled on one point: such dismissals are reserved for only the most egregious of cases, where there is " 'a clear record of delay or contumacious conduct by the plaintiff,' ... and where lesser sanctions would not serve the best interests of justice." *Rogers v. Kroger Co.,* 669 F.2d at 320 (citations omitted); *see Gray v. Fidelity Acceptance Corp.,* 634 F.2d 226, 227 (5th Cir.1981); *Boazman v. Economics Laboratory, Inc.,* 537 F.2d 210, 212 (5th Cir.1976). The conduct of the named plaintiffs here, although clearly pointing to a lack of interest in the prosecution of the action, hardly rises to the level of contumacious or egregious conduct. Moreover, sanctions less severe than a dismissal with prejudice were plainly available and desirable in this instance. We believe the district court, fully cognizant of the extreme cir-

not bar the second attempt. This Court, sitting *en banc,* reversed the decision of the trial court and directed that judgment be rendered for the defendants. In discussing the significance of Rule 41(b), Judge Godbold stated that the last sentence of the Rule "establishes a procedure for construing the general and ambiguous *dismissal order,* one which does not say whether it is with or without prejudice." 423 F.2d at 798 (emphasis added). The Court also cited with approval *Kern v. Hettinger,* 303 F.2d 333 (2d Cir.1962), a decision of the Second Circuit construing an order of dismissal that failed to specify whether it was with or without prejudice. The holding of the Court in *Weissinger* was, however, a narrow one, and was stated by Judge Godbold at the conclusion of his opinion:

"[G]oing behind [a dismissal] order, if ever allowed, is not authority that a dismissal specified to be with prejudice, entered after full trial on all issues and with complete findings and conclusions, may be treated as a mere warm-up for another trial if the unsuccessful party decides, without an appeal, that he would like to go around the track again." 423 F.2d at 799–800.

The present case involves a very different situation. The district court did not enter an order explicitly dismissing the suit with prejudice, but instead entered no formal order of dismissal. It therefore becomes necessary, as we describe in full above, to investigate the circumstances surrounding the dismissal of the class suit to determine whether it was an adjudication on the merits.

cumstances required to enter a dismissal with prejudice for failure to prosecute, opted for just such a less severe remedy in the form of a dismissal of the class action without prejudice. Given the hesitancy of this Court to endorse prejudicial dismissals for failure to prosecute and the circumstances under which this dismissal occurred, this interpretation of the district court's action is appropriate. We hold that the dismissal of the class action was without prejudice.[19]

■ This resolution clarifies the disposition of Ms. Phillips' claim that the district court failed to provide notice of the settlement between the United States and the School Board to the affected nonparty class members. Since the district court had dismissed the class action as of July 3, 1980, there was no class to notify when the settlement was reached on May 5, 1981. Once properly dismissed, the members of a former class suit no longer fall under the umbrella of the Rule 23(e) notice requirement. *See Pearson v. Ecological Science Corp.*, 522 F.2d 171, 177 (5th Cir.1975), *cert. denied*, 425 U.S. 912, 96 S.Ct. 1508, 47 L.Ed.2d 762 (1976) (after determination that class action is improper under Rule 23(c)(1), notice requirements of Rule 23(e) do not apply). Furthermore, notice of the consent decree *was* provided, and it was precisely that notice and opportunity to file written objections which brought Ms. Phillips into this dispute. In this type of class action, the "mechanics of the notice process are left to the discretion of the district court subject only to the broad 'reasonableness' standards imposed by due process." *Fowler v. Birmingham News Co.*, 608 F.2d 1055, 1059 (5th Cir.1979).[20] Ms. Phillips identifies no shortcomings in the method of notice employed by the district court; her general, conclusionary allegations will not suffice.

■ To complete the picture, we again note that Ms. Phillips attempted to intervene to set aside a consent decree negotiated and agreed upon by the only two parties to the suit, the United States and the Caddo Parish School Board. Neither Ms. Phillips nor her fellow citizens of Caddo Parish were parties to the decree entered in 1981. It is therefore axiomatic that Ms. Phillips—not having been a party to the decree—is not bound by *res judicata* to the terms of the decree. *See United States v. Allegheny-Ludlum Industries, Inc.*, 517 F.2d 826, 845 (5th Cir.1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976); *Rodriguez v. East Texas Motor Freight*, 505 F.2d 40, 65 (5th Cir.1974), *vacated on other grounds*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977); *United States v. Louisiana*, 90 F.R.D. 358, 362–63 (E.D.La.1981) (three-judge court), *aff'd*, 669 F.2d 314 (5th Cir.1982); *United States v. Board of Education*, 88 F.R.D. 679, 683 and n. 6 (N.D.Ill. 1981).

## THE MOTION TO INTERVENE

■ Ms. Phillips sought intervention under Rule 24(a)(2), intervention of right, and in the alternative under Rule 24(b)(2), permissive intervention.[21] The denial of a mo-

---

**19.** With respect to the effect of the ultimate judgment in the suit, the "class" members are in the same position they would have been in if the suit had not been brought as a class action.

**20.** The class action in *Fowler* was brought under Rule 23(b)(2), where "the party opposing the class has acted or refused to act on grounds generally applicable to the class ...." This would have been the appropriate category under which to make the class allegations here had the suit been filed after the effective date of the 1966 amendments to the federal rules.

**21.** Fed.R.Civ.P. 24 provides in part:
"(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
"(b) Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. When a

tion to intervene of right is appealable, *Weiser v. White,* 505 F.2d 912, 916–18 (5th Cir.), *cert. denied,* 421 U.S. 993, 95 S.Ct. 1998, 44 L.Ed.2d 482 (1975); however, the denial of a motion for permissive intervention is not appealable unless there is an abuse of discretion. *Woolen v. Surtran Taxicabs, Inc.,* 684 F.2d 324 (5th Cir.1982). Accordingly, we must review the merits of the claim of intervention to determine whether or not the district court's order denying intervention is appealable. *Weiser,* 505 F.2d at 916.

■ The district court found Ms. Phillips' motion to intervene deficient because it was untimely and because it failed to raise new issues that had not previously been considered by the parties to the consent decree. An application for intervention under either Rule 24(a) or Rule 24(b) must be "timely." *NAACP v. New York,* 413 U.S. 345, 366, 93 S.Ct. 2591, 2603, 37 L.Ed.2d 648 (1973); *Stallworth v. Monsanto Co.,* 558 F.2d 257, 263 (5th Cir.1977). Timeliness "is not a word of exactitude or of precisely measurable dimensions," *McDonald v. E.J. Lavino Co.,* 430 F.2d 1065, 1074 (5th Cir.1970); instead, it is a measure "to be determined from all the circumstances." *NAACP v. New York,* 413 U.S. at 366, 93 S.Ct. at 2603. As such, its determination in any given case is an exercise committed to the sound discretion of the district court, subject to reversal by an appellate court only for an abuse of that discretion. *Id.* at 366, 93 S.Ct. at 2603; *United States v. United States Steel Corp.,* 548 F.2d 1232, 1235 (5th Cir. 1977). In *United States v. Marion County School District,* 590 F.2d 146, 148–49 (5th Cir.1979), we discussed the elements of the timeliness requirement within the context of a school desegregation action:

"Timeliness is a function of the relative prejudice to the existing parties and the would-be intervenor. The district court, in exercising its discretion to weigh the relative prejudice to each, must put into the balance against the movant its prior opportunities to assert its position and its protection through representation by the existing parties. In weighing possible prejudice to the existing parties the court must consider what has happened as a result of the movant's failure to apply for intervention as soon as it knew or reasonably should have known of its interest in the case."

*See also Stallworth,* 558 F.2d at 264–66.

■ An assessment of these factors in this case leads to the conclusion that Ms. Phillips' proposed intervention was untimely on its face. From the filing of this action in 1965 until May 22, 1981, the date of her motion to intervene, Ms. Phillips made no effort to intervene to assert either her views or those of a purported class. Although her petition to intervene asserts the inadequacy of "most of the actions of [the district court] since the original filings of this suit," she remained conspicuously silent through almost sixteen years of legal proceedings and negotiations. Ms. Phillips also assails the 1973 Committee desegregation plan for failing to benefit the class which she seeks to represent, yet she waited eight years to voice this objection. Similarly, when the district court declared the Caddo Parish school system unitary in 1977, Ms. Phillips neither attempted to intervene nor did she make any effort to join the United States in seeking to amend the judgment. During the early months of 1981, when community meetings were held throughout the parish to discuss desegregation proposals, the record again reflects no attempt to intervene. It was not until May 22, 1981, fifteen days after the formal entry of the consent decree and four days after the expiration of the period for filing objections to the decree, that Ms. Phillips moved to intervene in an effort to set aside the consent decree.

party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."

Under circumstances evincing comparable delays in seeking intervention, this Court has found such applications untimely. In *United States v. Marion County School District, supra,* a school desegregation action originally brought by the United States in 1967, we affirmed the denial of two motions to intervene made by an organization of parents, the first of which was filed in 1977. In finding the 1977 petition for intervention to be untimely, we noted that

"[the organization's] initial motion seeking the return of grades 7–12 to the Improve school was filed ten years after the commencement of Marion County's school litigation, seven years after the court-ordered removal of grades 9–12 from Improve, and four years after implementation of the modified plan removing grades 7 and 8." 590 F.2d at 149.

More recently, we held untimely an attempt to intervene by the NAACP seven years after the United States initiated litigation against the State of Louisiana over the desegregation of its higher education system. *United States v. Louisiana, supra.* There, the NAACP initially moved to intervene only two years into the suit and, after the motion had been denied by the district court, we remanded the case for a hearing on the motion to intervene, *United States v. Louisiana,* 543 F.2d 1125 (5th Cir.1976). On remand, the intervention question was not pursued, the NAACP having chosen instead to participate as amicus curiae. However, in 1981 the NAACP again moved to intervene, and this motion was denied because, *inter alia,* the NAACP had failed to satisfy the timeliness requirement of Rule 24. "We cannot say, in view of the NAACP's great and undisputed delay—over four years—in advancing the second motion that the order denying it was [an abuse of discretion]." 669 F.2d at 315. *See also United States v. Carroll County Board of Education,* 427 F.2d 141, 142 (5th Cir.1970).

Ms. Phillips' inordinate delay in seeking intervenor status is even less understandable when we recognize that her role in the community probably kept her apprised of many of the developments in this action. The record indicates that the United States subpoenaed Ms. Phillips to appear "as a witness to assist the Government at counsel table during the taking of various depositions" during the proceedings held by the Special Master in 1976. Thus, Ms. Phillips was present during testimony and proceedings addressed to the question of the School Board's compliance with the 1973 Committee desegregation plan and, although she now objects to that plan, she did not intervene either to modify that plan or to question the School Board's fulfillment of its objectives. Moreover, prior to these hearings the School Board had moved for a declaration of unitary status, yet Ms. Phillips also did not intervene to oppose that motion. Furthermore, movant's first supplemental motion to intervene acknowledges that she had contact with one of the Justice Department lawyers representing the United States in the settlement negotiations with the School Board. Her motion states that this lawyer "obtained input" from her and that he "held meetings in the Black community to obtain input from the Black community." Thus, it appears likely that to an extent Ms. Phillips was apprised of the settlement efforts well before the entry of the consent decree; yet, she made no effort to intervene at that point.[22]

---

**22.** In her first supplemental motion to intervene, Ms. Phillips downplays the significance of her contact with the government lawyer by suggesting, on information and belief, that his participation in the proceedings "apparently terminated" and he was replaced by another government lawyer ("sometime" between November 1980 and March 1981), with whom she had no contact. According to Ms. Phillips' information and belief, the new lawyer "primarily represented the Justice Department in negotiating the May, 1981 Consent Decree."

The case file reflects that this "new" Justice Department attorney became counsel in the proceedings in November 1980 (another Justice Department attorney has been on all its pleadings in the case since at least November 1976). Even with this change in representatives for the United States—which Ms. Phillips deems significant—she did not move to intervene. Instead, she opted to wait for the outcome of the negotiations and then press her application for intervention.

The issue of timeliness, according to Ms. Phillips, "is at least partially linked to the question of adequate representation," *Piambino v. Bailey,* 610 F.2d 1306, 1321 (5th Cir.), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980), and, she argues, must be determined here from the date the consent degree was signed. In her original motion to intervene (and in her second supplemental and amended motion), Ms. Phillips offers no explanation whatever for her failure to seek intervention earlier. In her first supplemental motion to intervene, she states that she did not learn of "the contents of the Consent Decree until the week of May 11 to May 15, 1981." [23] She also states that she had "presumed that the United States would represent the best interest" of herself and the class she seeks to represent, but that it did not in that the consent decree's terms were not what she says they should have been. She offers no other reason for not seeking intervention sooner. She does not allege, directly or inferentially, that the United States or anyone else misled her or members of the class she seeks to represent in any way, or that she (or the "class") was led to believe, or even did believe, that the consent decree would contain some particular provision which it omitted, or that it would not include some particular provision which it did in fact contain. She does not allege that she, or the class she seeks to represent, was unaware of either the prolonged settlement negotiations, lasting for almost a year, leading up to the consent decree, or of the numerous public meetings,

held during February, March, and April 1981, in reference thereto, or that she, or the "class," was ever unaware of the status of the litigation and the conditions in the schools since a time well before 1973.

 As applied to these circumstances it seems clear that Ms. Phillips "knew or reasonably should have known of [her] interest in the case" long before she filed her petition to intervene. *Stallworth,* 558 F.2d at 264. As established in *Stallworth, id.,* and *Marion County,* 590 F.2d at 149, the relevant time period for gauging the timeliness of an application for intervention begins when the proposed intervenor knew or should have known of his or her interest in the case; actual knowledge is not required. The premise of her position—that the 1981 decree was the first indication that her interests were not represented by any existing party and that she then became aware of her interest in the case—is not supported by the record. The 1973 Committee desegregation plan, which Ms. Phillips claims failed to eliminate the remnants of the dual school system, has been in operation since the start of the 1973–74 school year. This scheme, an allegedly unconstitutional plan, was in place for eight years prior to the 1981 consent decree, without objection from the original plaintiffs (or Ms. Phillips). During this period, Ms. Phillips surely knew of her interest in the case and, moreover, she should have known that the interest she now asserts as applicant for intervention— the further desegregation of the parish schools—was not represented by the private

We also note that at oral argument counsel for the School Board provided other indicia of Ms. Phillips' knowledge of the course of these proceedings. He indicated that Ms. Phillips was a member of the Caddo Parish School Board during 1975 and 1976, apparently as an interim appointee filling an unexpired term. This suggests that she possessed some knowledge of the 1973 desegregation plan and the parish's compliance with its directives. It also may explain why, as the case file reflects, the United States elected to subpoena Ms. Phillips as an assistant during the hearings before the Special Master in 1976. Counsel further stated that Ms. Phillips appeared at one of the public meetings in 1981, where she addressed the subject which later became the basis for her objection to the consent decree, the need for enrich-

ment programs for the black students. Ms. Phillips' counsel did not on oral argument here directly or indirectly question any of these matters, nor has he done so at any other time (though having filed several post-argument briefs with this Court); nor do Ms. Phillips' filings in the district court even infer anything to the contrary.

23. Ms. Phillips does not say when she learned the consent decree was issued, or when during the period May 11 to May 15 she learned its contents. The record indicates the decree was published in full in the local newspapers several days prior to May 11 and received extensive media publicity, none of which is denied by Ms. Phillips.

plaintiffs. In addition, the United States was also a party during the eight-year period, basically acceding to the implementation and continued operation of the 1973 scheme.[24]

Ms. Phillips further withheld from seeking intervention during the almost year-long negotiations between the United States and the School Board, even though the negotiations received publicity in the community, and meetings were held throughout the parish to discuss various desegregation proposals. We find it difficult to reconcile Ms. Phillips' attempted intervention *after* the parties had negotiated a settlement and the district court had entered a consent decree with any proper regard for the settlement process itself. We fully recognize that "school desegregation is one of the areas in which voluntary resolution is preferable to full litigation because the spirit of cooperation inherent in good faith settlement is essential to the true long-range success of any desegregation remedy." *Armstrong v. Board of School Directors,* 616 F.2d 305, 318 (7th Cir.1980); *see United States v. Board of Education,* 88

F.R.D. at 685. This statement is particularly meaningful in the context of this seventeen-year litigation, which, after several trips to this Court and the gradual exodus of the private parties, has culminated in a consent decree agreed upon by the remaining parties and approved by the district court. "Intervention after entry of a consent decree is reserved for exceptional cases." *Alaniz v. Tillie Lewis Foods,* 572 F.2d 657, 659 (9th Cir.), *cert. denied,* 439 U.S. 837, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978). If Ms. Phillips is permitted to intervene at this late date to interpose *her* views, we see little to prevent other nonparties from similarly coming forward to voice objections to the decree. More importantly, should Ms. Phillips' protests be accounted for, and the consent decree accordingly reformed, what would then preclude Ms. Smith or Mr. Jones or any other resident of the parish from intervening in opposition to the new decree?

Under these circumstances, then, we hold that the district court did not abuse its discretion in ruling that Ms. Phillips' request for intervention was untimely.[25]

**24.** Although the United States initially objected to the 1973 Committee plan, it eventually attached a qualified approval of the plan to the order directing its implementation. After the 1973 plan became operative, the United States did not affirmatively move to correct or improve its directives; the involvement by the government since that date has been only reactive: opposing the School Board's motions for declaration of unitary status and for relief from the faculty racial percentage requirements.

**25.** The district court also denied intervention because it found that "the issues raised by Phillips in her initial motion have all been considered and addressed by the Board and the Department of Justice. There can be no question that the same is true of the issues raised in the first and second supplemental motions." In the parlance of Rule 24(a), the court found that "the applicant's interest [was] adequately represented by existing parties."

In view of our resolution of the timeliness issue, it is not necessary to decide this issue today. Nonetheless, we do note that Ms. Phillips' principal dispute with the 1981 consent decree is over the type and extent of relief it provides; a disagreement that reflects more a difference in "policy" than any genuine shortcoming in the representation provided by the

United States as plaintiff-intervenor. The test for adequate representation by existing parties in a school desegregation context is well-established:

"If the court determined that the issues [the proposed intervenors] sought to present had been previously determined or if it found that the parties in the original action were aware of these issues and completely competent to represent the interests of the new group, it could deny intervention." *Hines v. Rapides Parish School Board,* 479 F.2d 762, 765 (5th Cir.1973).

*See United States v. Marion County School District, supra; Pate v. Dade County School Board,* 588 F.2d 501, 503 (5th Cir.), *cert. denied,* 444 U.S. 835, 100 S.Ct. 67, 62 L.Ed.2d 44 (1979). The burden of establishing inadequate representation is on the applicant for intervention, *United States v. South Bend Community School Corp.,* 511 F.Supp. 1352, 1357 (N.D.Ind. 1981), *aff'd mem.,* 688 F.2d 842 (7th Cir.1982), and the applicant must make a " 'very compelling showing' that representation of the public interest by the United States is not adequate in suits such as this ...." *United States v. Board of Education,* 88 F.R.D. 679 at 686 (citation omitted).

It is apparent that Ms. Phillips' primary complaint on appeal about the decree—its retention of some fourteen predominately black

## A HEARING ON THE MOTION TO INTERVENE

■ The district court denied Ms. Phillips' motion to intervene without holding an evidentiary hearing, despite a request for such a hearing in her original motion.[26] This Court has indicated generally that due process requires that proposed intervenors be provided a hearing prior to a ruling on their motions to intervene. *See Adams v. Baldwin County Board of Education,* 628 F.2d 895, 897 (5th Cir.1980); *Jones v. Caddo Parish School Board,* 499 F.2d at 917; *Calhoun v. Cook,* 487 F.2d 680, 683 (5th Cir. 1973). We do not retreat from that position today. We do, however, believe that on the record before the district court Ms. Phillips' intervention was prima facie untimely, and as she tendered to the district court no factual allegations which, if true, would establish the contrary, the district court was not obliged to hold an evidentiary hearing. *See United States v. Louisiana,* 669 F.2d at 315; *United States v. Perry County Board of Education,* 567 F.2d 277, 280 (5th Cir.1978).

## CONCLUSION

■ Under the law of this Circuit, where intervention of right is properly denied and permissive intervention is denied without an abuse of discretion, the decision of the district court is not appealable and we must dismiss the appeal for want of jurisdiction. *Weiser,* 505 F.2d at 916; 7A C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 1923 at 629 (1972).

APPEAL DISMISSED.

schools—was a topic that received much attention in the negotiations between the School Board and the United States. According to the School Board, the plan contained in the consent decree will reduce the number of one-race schools from thirty-three to fourteen. Further, it provides for several desegregation methods, such as majority-to-minority· transfers and magnet and lab schools, that can also reduce the number of one-race schools. It appears unlikely that Ms. Phillips can satisfy the requirement of showing that representation by the United States was inadequate on this issue.

In her brief to this Court, Ms. Phillips points to a newspaper article, published May 14, 1981 in the Shreveport Journal, concerning an interview given by the United States Attorney for the Western District of Louisiana regarding what the article calls a "closed door" meeting March 16, 1981 with the Justice Department. Ms. Phillips directs our attention, *inter alia,* to statements in the article that "[a]t that meeting, the U.S. Justice Department backed off its previous stand of insisting on pairing Caddo [Parish elementary schools]"; that the United States Attorney "said his position was that if the Justice Department did not discontinue advocating pairing or cross-town busing of elementary students that the lawsuit against the School Board would go to court and that 'public education in the parish would suffer.' The longest distance a student will be bused in accordance with the Caddo desegregation plan is less than five miles, [the United States Attorney] said"; and that the United States Attorney "said that after the Caddo school case was transferred to ... Judge Tom Stagg [in August 1979] it became obvious that further action would be taken because of the present law not allowing a large number of predominantly one-race schools in such cases." Although the article was published in the local paper over a week before Ms. Phillips' first motion to intervene, she made no such or similar allegations before the district court, nor did she there allege that the United States or the School Board led her (or the "class") to believe, or that she (or the "class") in fact believed, that the settlement between the United States and the School Board would provide for more elementary school pairing or crosstown busing than it did.

While proof of collusion between a nominal representative and an opposing party will establish inadequate representation, *see Martin v. Kalvar Corp.,* 411 F.2d 552, 553 (5th Cir.1969); *United States v. Board of School Commissioners,* 466 F.2d 573, 575 (7th Cir.1972), *cert. denied,* 410 U.S. 909, 93 S.Ct. 964, 35 L.Ed.2d 271 (1973), we find nothing improper in the government, through the Justice Department, conferring with its representative in the State of Louisiana. Even assuming that the government altered its position on these elementary schools, this decision was probably indicative of the bargaining that is essential to reaching a viable settlement agreement, a method of resolving school desegregation matters that is preferable to complete litigation. *See Armstrong,* 616 F.2d at 318. Despite possible "policy" or "emphasis" shifts in the executive and legislative branches of government, we refuse to infer that the Justice Department is no longer enforcing the fourteenth amendment in active matters such as this one. *See United States v. Board of Education,* 88 F.R.D. at 687 n. 9.

26. On appeal, Ms. Phillips asks that this Court remand her case to the district court with directions to permit her intervention. A hearing on the motion to intervene, according to Ms. Phillips, would be "a total waste of time."

JERRE S. WILLIAMS, Circuit Judge, concurring:

I concur fully in the opinion of Judge Garwood for the majority of the Court. I add a few words to express my own views as to the relationship between that majority opinion and Judge Goldberg's opinion in dissent.

I feel great sympathy for the anguish which my brother Goldberg reveals in his dissenting opinion. I simply wish to state why I do not feel that same anguish although I, along with all the members of the Court, is deeply concerned with enforcing the constitutional rights of minorities by eliminating racial discrimination in the public schools.

Judge Goldberg himself emphasizes that this case has now dragged along for almost eighteen years. There must be an opportunity to end such litigation some time. The critical question the Court had to deal with was whether that time had come in a detailed consent decree acquiesced in by most members of the community, white and black, and agreed to by the School Board, by the federal district judge, and by the United States Department of Justice, and publicized so that all concerned persons could react to it.

It is well to point out also that there had been ample earlier opportunity to appellant and others to participate in the judicial processes of this case. After our decision in *Jones v. Caddo Parish School Board,* 499 F.2d 914 (5th Cir.1974), those persons concerned about the racial integration of the Caddo Parish Schools took no further action to intervene. Rather than this lack of action being "inexplicable", we obviously must assume that the failure to take further action and to allow the schools to continue in their then present form was a voluntary act on the part of those who had pursued the appeal to this Court. Phillips or others could have acted then. Further there is later a period of several years during which appellant and others could have sought intervention when the district court held the school system unitary—a decision set aside on petition of the United States Department of Justice.

But the most critical time involves the development of the current district court order which is here appealed. I emphasize that the posture of the case as it comes to this Court is one in which every attempt has been made to be fair to everyone, a final order has been entered, and now someone wants to reopen the case to start over again. Phillips was fully aware of the proposed settlement and submitted comments. The record reveals that Phillips had earlier been a participant in various aspects of the case. With the dominant forces in the community, both white and black, seemingly willing to accept the proposed settlement and the United States Department of Justice participating in the settlement, Phillips had no right to assume at that late hour that she could be confident that whatever suggestions she made would automatically become part of that order. The time for her intervention was of necessity the time while the proposed settlement was still pending. There was ample time then. If she had moved to intervene at that time, the law is clear that she would have been entitled to a hearing and a specific decision on her motion to intervene. But she waited until the matter was all over, until an eighteen year case was finally concluded, and then said that because she did not like the settlement she wanted to intervene, have it thrown out, and start over again with a class action. Her motion to intervene under these circumstances was not timely, and we properly so hold.

Finally, there should be a general observation. No such settlement can ever be expected to be satisfactory to everyone in a community. But, as I stated earlier, there must be a way to end these cases even though not everyone is satisfied. This record reveals that the district court with great care, as described in the majority opinion, brought about the final disposition of this case. There can properly be anguish for those who do not agree with the settlement. But there could also be anguish felt for this troubled community if after the many years of these proceedings and finally

a settlement, those who do disagree with it can upset the careful action of the community, the court, and the United States Government and start over again.

What may be the rights of appellant and others in a new and independent suit brought by them is not now before us. But the motion to intervene to set aside the settlement between the Caddo Parish School Board and the United States Department of Justice, approved by the district court, was not timely. The time for intervention was before settlement, not after.

GOLDBERG, Circuit Judge, dissenting:

This is a ghost story, a tale better suited for campfires and dark, stormy nights than for the pages of the *Federal Reporter*. It is a story of a disembodied class of black students of Caddo Parish seeking vainly to vindicate their constitutional right to attend desegregated schools. It is a story of the Fifth Circuit, refusing to grant even a hearing to the proposed intervenor-class representative, acting more like a child whistling in the dark than a court of justice, afraid to look out the window and see if the mournful cries actually emanate from somebody or are just the products of a frightened imagination.

The judicial efforts to desegregate the Caddo Parish schools began some eighteen years ago. Despite the fact that the action was originally filed as a class action, and despite the fact that a group of potential intervenors sought to represent a class of black plaintiffs, no class has ever been certified. Accordingly, the black students and parents of the Caddo Parish schools, the phantom class haunting this lawsuit, have had to rely on surrogates to present their views. After the Justice Department and Caddo Parish negotiated a consent decree, appellant-intervenor June Phillips concluded that this virtual representation amounted to virtual neglect and attempted to intervene on behalf of the ghost class of black students and parents.

The trial court below denied the motion to intervene without even granting a hearing, because it determined from the plead-ings that the motion was untimely and that the interests of the proposed intervenor were adequately represented by the Justice Department. The majority today holds that the request to intervene was so manifestly untimely that it did not merit that most fundamental procedural device, a hearing. It appears to me, however, that June Phillips has made claims that, if true, would show that her interests and the interests of the class she hopes to represent are not adequately represented by the Justice Department, and that her motion to intervene was timely. Accordingly, I conclude that Phillips deserves at least a hearing on her motion and I respectfully dissent.

## I. INTRODUCTION

### A. Factual and Procedural Background

I pause briefly to discuss the background of this case, not because I believe there is any shortcoming in the thorough and fair history presented in the majority opinion, but simply because some of the events that occurred have a hidden side that becomes visible when viewed from the perspective of the ghost class of black students and parents. Because the ruling that is the subject of this appeal is the denial of a hearing, I have no findings of fact to use in presenting this background. Accordingly, I will take an approach similar to that used when reviewing a motion for summary judgment and view the facts and inferences in the light most favorable to the appellant, Phillips.

The first inference I shall draw is that there exists within the confines of Caddo Parish a class of black students and parents desiring the maximal amount of desegregation required by law. Several factors support this modest assumption. First, Phillips herself claims she would represent such a class. Second, the suit was initially brought on behalf of such a class. Finally, parties purporting to represent such a class attempted to intervene in late 1973. Given the procedural posture of this appeal and the fact that never in the history of this lawsuit has the trial court held any kind of

hearing to determine the composition and interests of the plaintiff class, this first inference seems quite justified.

Viewed in the light of this modest assumption, the history of this case takes on an unpleasant character. The record shows three separate occasions when groups initially representing the interests of the phantom class changed their positions. The original named plaintiffs seemed at first to represent the interests of the phantom class. In mid-1973, however, the original named plaintiffs acquiesced in a "desegregation" plan that allowed the continued operation of thirty-four one-race or predominantly one-race schools. This was the first lapse in representation of the phantom class.

After this first lapse, additional named plaintiffs sought to intervene to press for more energetic desegregation. The trial court denied the motion for intervention and the would-be intervenors appealed to this Court. We ruled that the district court should have held a hearing on the intervention motion. *Jones v. Caddo Parish School Board,* 499 F.2d 914 (5th Cir.1974). Inexplicably, after their victory in this Court, the would-be intervenors did nothing. As the majority notes, "on remand, no hearing was sought or held." This was the second lapse in representation.

There was still hope for the phantom class, however, because the Justice Department was still participating in the case. From the time the Justice Department entered the case in the mid-1960's until early 1981, the Justice Department was undisputedly a vigorous advocate of the interests of the phantom class. The Justice Department consistently objected to excessive numbers of mostly one-race schools, premature declarations that the vestiges of segregation had been eliminated, and attempts to hinder desegregation of the faculty. In early 1981, however, the Justice Department apparently adopted a different approach to school desegregation cases and negotiated a consent decree that would leave forty-seven percent of the black students in one-race or predominantly one-race schools.[1] Once again, it seems that the representation of the interests of the phantom class has lapsed. Because representation of interests by the government is one of the key issues in this appeal, I will address this point at greater length below.

### B. Issues on Appeal

This case is rife with disturbing issues. The most troubling aspect of the majority's result is the fact that Phillips' motion to intervene was denied without a hearing.[2] In the process of denying the appellant a hearing, the majority makes nominal obeisance to the many cases of this Circuit stating the clear necessity for a hearing. As we stated in *Adams v. Baldwin County Board of Education,* 628 F.2d 895, 897 (5th Cir.1980):

When parents move to intervene in school desegregation cases, the important

---

1. There is some dispute over this figure, but given the procedural posture of the case I must accept Phillips' contention.

2. There are two other items that trouble me enough that I must at least allude to them. First is the majority's treatment of the class status of this action. This case was filed as a class action at a time when certification was not required. That would seem initially to qualify this case as a class action. Furthermore, on the last appeal to this court, *Jones v. Caddo Parish School Bd.,* 499 F.2d 914 (5th Cir.1974), the case was plainly held to be a class action. Thus, notwithstanding any retroactive application of the 1966 amendments to the Federal Rules of Civil Procedure, the law of the case demands that this case be treated as a class action. If the case were a class action, I have serious doubts that Fed.R.Civ.P. 23(e), calling for notice to the class before dismissal, does not apply as the majority holds it does not.

Second, as a judge of this Court, I am greatly distressed to see a mandate of this Court calling for a remand to determine the nature and composition of the plaintiff class, *id.,* ignored by judge and litigants alike. Even if the victorious appellants did not act, I think the *judge* had some duty after the mandate to ensure that the named class representatives actually represented the class.

I do not belabor those points now because I believe that merely holding a hearing on intervention, which the majority also denies, would suffice to cure these other ills.

constitutional rights at stake demand a scrupulous regard for due process considerations, *Jones v. Caddo Parish School Board,* 499 F.2d 914 (5th Cir.1974). This Court has determined that intervention, rather than a separate action, is the proper vehicle for parents claiming inadequate representation to assert their rights. Denial of a plea in intervention, therefore, often will deprive those parties of their only opportunity to be heard. Consequently, we adhere to our earlier decisions requiring the district court to conduct an evidentiary hearing and to enter findings based upon an adequate record. *Jones v. Caddo Parish School Board,* 499 F.2d 914 (5th Cir.1974); *Calhoun v. Cook,* 487 F.2d 680 (5th Cir.1973). *See also United States v. Perry County Board of Education,* 567 F.2d 277 (5th Cir.1978).

The two cases upon which the majority relies to deny the motion without a hearing at most stand for the proposition that a hearing is not required when "it is more than clear that appellants are not entitled to intervene." *United States v. Perry County Board of Education,* 567 F.2d 277, 280 (5th Cir.1978). *See also United States v. Louisiana,* 669 F.2d 314 (5th Cir.1982) (trial court denied NAACP's motion to intervene, this Court remanded for hearing but none was held, and after four years of inactivity NAACP renewed its motion to intervene; no hearing on timeliness was necessary on those facts). Accordingly, I believe that the appellant's burden to show that she was entitled to a hearing is minimal—I believe that under our cases she need establish only that it is not clear that she is not entitled to intervention. Stated positively, I believe that all Phillips must show to earn a hearing is a mere possibility that she is entitled to intervention.

Intervention of right under Fed.R.Civ.P. 24(a)(2) has four requirements: (1) the application must be timely; (2) the movant must have an interest in the case; (3) disposition of the case would impair the movant's interest; (4) the movant's interests are not adequately represented by the existing parties. The trial court denied intervention because the motion was not timely and because the movant's interests were adequately represented by the Justice Department. The majority agreed that the motion was untimely, and so did not fully discuss the issue of adequacy of representation.

Because I disagree with the district court's disposition of the motion, I must address both timeliness and adequacy of representation. Because the issue of timeliness "is at least partially linked to the question of adequate representation," *Piambino v. Bailey,* 610 F.2d 1306, 1321 (5th Cir.), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980), I shall discuss adequacy of representation first, and then address timeliness.

## II. ADEQUACY OF REPRESENTATION

It makes no sense to let a movant intervene if that movant will add nothing to the judicial process. Our adversarial system presumes that a party with a particular interest will put forth all reasonable arguments advancing that interest. These two principles together produce the idea that a movant may not intervene of right if his or her interests are adequately represented by the existing parties. In application this simple proposition becomes complicated. First, it is not always clear whether the various parties represent same interests. Second, to the extent the same interests are represented, that representation may not be adequate. Third, when the government is a party, the movant has a heavier burden in showing inadequacy of representation. I will address each of these points in turn.

### A. Identity of Interests

The first step in determining adequacy of representation is to determine whether the interests of the movant are already represented by a party to the litigation. This is not a yes-no question. On occasion the answer may be clear, because the interests are either identical, as in the case of derivative rights, or totally adverse. A more troubling case occurs when interests are similar. *See* 7A C. Wright & A. Miller,

*Federal Practice and Procedure* § 1909 (1972). Such appears to be the case here.

To determine the degree of similarity of interests, I must first, of course, determine what the various interests are. An interest could be defined broadly, such as an interest in fairness, or more narrowly, in terms of specific remedies. Interests should not be defined broadly in seeking to measure adequacy of representation, because very often an intervenor is interested in the type of relief to be provided. Suppose two groups were both interested in school desegregation and both wanted to abolish de jure segregation, but one group wanted to institute a freedom of choice plan while the other group wanted busing. It would be ludicrous to claim that both groups had the same interests because both wanted desegregation. The only sensible analysis is that the two groups have different interests because their ultimate goals are different.

This Circuit has repeatedly held that different final objectives constitute different interests for the purpose of determining adequacy of representation. *See Woolen v. Surtran Taxicabs, Inc.*, 684 F.2d 324, 333 (5th Cir.1982) (in antitrust suits when one group seeks injunctive relief and another group seeks damages, interests are different); *International Tank Terminals v. M/V Acadia Forest*, 579 F.2d 964, 967 (5th Cir. 1978) (quoting *Commonwealth of Virginia v. Westinghouse Electric Corp.*, 542 F.2d 214, 216 (4th Cir.1976)) (identity of interest determined by "ultimate objective"); *Cohn v. EEOC*, 569 F.2d 909, 911 (5th Cir.1978) (interest of movant in reducing range of sanctions for contempt citation different from interest of EEOC in contesting contempt in first place).

Ironically, one of the clearest statements of this principal is *Jones v. Caddo Parish School Board*, 499 F.2d 914 (1974). In facts obviously similar to the present appeal, movants attempted to intervene representing a class of black plaintiffs who objected to the excessive number of predominantly one-race schools. The party-plaintiff, as I have mentioned, acquiesced in the committee plan. This Court stated that movants who claimed they "represent[ed] a class who desire the achievement of greater desegregation than is necessary to satisfy plaintiffs," *id.* at 917, should be given a hearing. That is both literally and figuratively this case. The movant here desires a reduction in the number of one-race schools in Caddo Parish. The Justice Department, as evidenced by the consent decree, did not share that interest. Once again, we have in Caddo Parish "a class who desire the achievement of greater desegregation than is necessary to satisfy plaintiffs." Once again, the case should be remanded for a hearing.

### B. Adequacy of Representation

The second inquiry in determining adequacy of representation of interests is to determine *adequacy*. Whether a surrogate will adequately represent the interests of the movant of course depends in part on the identity of their interests. If the interests of the two groups are actually adverse, no amount of enthusiasm on the part of the party will constitute adequate representation. On the other hand, if the interests of the two groups appear to be identical, the surrogate's representation will be adequate absent a showing of collusion, some adverse interest, or a failure to fulfill the ability of representation. *See, e.g., United States v. United States Steel Corp.*, 548 F.2d 1232 (5th Cir.1977).

Again, the harder problems occur when interests are merely similar. In that case, the enthusiasm of the party may determine whether representation is adequate. If a party has interests similar to those of the movant, but is lackadaisical in presenting them, representation will not be adequate. *See Liddell v. Caldwell*, 546 F.2d 768 (8th Cir.1976), *cert. denied*, 433 U.S. 914, 97 S.Ct. 2987, 53 L.Ed.2d 1100 (1977) (inadequate representation because party had abandoned interest as evidenced by entry of consent decree); *Nuesse v. Camp*, 385 F.2d 694, 704 n. 10 (D.C.Cir.1967) ("Of course, even where the interests of a person may have been adequately represented at trial, failure to take an appeal from an adverse

judgment may introduce the element of inadequacy, entitling the interested person to intervene after judgment to file an appeal.") The Fifth Circuit took this position in *United States v. Georgia*, 428 F.2d 377 (5th Cir.1970), where intervention was allowed because the United States failed to appeal on an issue.

In this case the Justice Department evidenced an even more striking lack of enthusiasm. Though sharing with the movant a similar interest in reducing one-race schools, the Justice Department not only did not appeal from a result leaving forty-seven percent of the black students in Caddo Parish in predominantly one-race schools, the Justice Department did not even contest that result at trial. Rather, the Justice Department willingly embraced that result as part of a consent decree it had itself negotiated. This is surely not sufficiently vigorous representation of the movant's interest in reaching the maximum amount of desegregation possible.[3]

### C. Government as Party

Some cases hold that a movant has a greater burden when attempting to show that the government is an inadequate representative of the movant's interests. *See* C. Wright & A. Miller, *supra,* § 1909, at 528 n. 85. This requirement, however, does not impose any qualitatively different burden when the government is a party. "It means only that there must be a concrete showing of circumstances in the particular case that make the representation inadequate." *Id.* at 529. Thus, a mere claim to intervene to represent the black community's interest in desegregation would probably not be adequate if the Justice Department were in the case. *See, e.g., United States v. Carroll County Board of Education,* 427 F.2d 141 (5th Cir.1970).

In this case, however, the movant has indeed alleged circumstances that would concretely show inadequacy of representation. Phillips has claimed an interest in a greater degree of desegregation than the Justice Department desired. An interest in a different sort of remedy from that the government desires is sufficient to support intervention of right. *Cohn v. EEOC, supra.* Phillips has also claimed a greater degree of enthusiasm than the government showed in negotiating this consent decree. A willingness to press a claim more vigorously than the government is also sufficient to show inadequacy and support intervention of right. *United States v. Georgia, supra.*

### D. Conclusion on Adequacy

Phillips was denied intervention in part because the trial court thought her interests were adequately represented by the government. But the government was willing to leave forty-seven percent of the black students in Caddo Parish in predominantly one-race schools. Phillips has a different interest from the Justice Department at least to the extent that the Justice Department can accept that fact and Phillips cannot. Furthermore, the government is so content with that result that it did not even contest it with a trial, much less an appeal.

---

**3.** The majority cites *Hines v. Rapides Parish School Board,* 479 F.2d 762 (5th Cir.1973), as establishing the definitive test for adequacy of representation. The majority relies on the following language:

> If the court determined that the issues [the proposed intervenors] sought to present had been previously determined or if it found that the parties in the original action were aware of those issues and completely competent to represent the interests of the new group, it could deny intervention.

*Id.* at 765. The majority notes that the parties were aware of the problem of one-race schools and discussed it, and concludes that it is unlikely that the movant could show inadequacy.

I believe that the majority misinterprets *Hines.* First, Fed.R.Civ.P. 24(a)(2) does not include any special test for school cases. The basic standard for adequacy in school cases is the same as in all others. *Hines* does not purport to be doing anything quite as radical as creating a separate standard. No argument for that is given, nor are any cases cited. *Hines* merely summarizes in general terms the requirements for intervention. The first leg of *Hines* merely requires that the motion be timely; the second leg of *Hines* restates the requirement of adequacy. If anything, *Hines* strengthens the adequacy requirement by requiring that the parties be "*completely* competent" to represent the interests of the movant.

Thus, at least to some degree it appears that Phillips' interests were not adequately represented. Whether or not Phillips has established inadequacy as a matter of law, she certainly has alleged facts that if true, would show inadequacy. She deserves a hearing on her contentions. Due process can tolerate no less than that.

## III. TIMELINESS

A motion to intervene must be timely, Fed.R.Civ.P. 24, and a determination of timeliness is within the discretion of the trial court, to be reversed only for an abuse of discretion. *NAACP v. New York,* 413 U.S. 345, 366, 93 S.Ct. 2591, 2603, 37 L.Ed.2d 648 (1973). The trial court found, and the majority agreed, that Phillips' motion was untimely on its face, so that no hearing need have been held. My examination of the authorities in this Circuit convinces me that Phillips has alleged circumstances that would, if true, make her motion timely. Accordingly, I believe the motion to intervene should be remanded for a hearing on the issue of timeliness.

### A. Majority Opinion

My basic disagreement with the majority opinion is simple but fundamental: I believe the majority fundamentally misunderstands the opinion of this Court in *Stallworth v. Monsanto Co.,* 558 F.2d 257 (5th Cir.1977) (per Clark, C.J.). The majority states "[a]s established in *Stallworth, id.* [at 264], and [*United States v. Marion County,* 590 F.2d 146, 149 (5th Cir.1979)], the relevant time period for gauging the timeliness of an application for intervention begins when the proposed intervenor knew or should have known of his or her interest in the case." Majority Opinion, at 220. The majority concludes that given the long history of the case, the publicity surrounding the consent decree negotiations and Phillips' involvement in the negotiations, Phillips should have known of her interest in the case long before she moved to intervene.

### B. Stallworth *and Progeny*

As I read *Stallworth,* the clock does not start running on timeliness until the proposed intervenor knows or reasonably should know that intervention is necessary to protect the intervenor's interests. To be fair to the majority, *Stallworth* does use the phrase "know or reasonably should have known about his interest in the case." *E.g.,* 558 F.2d at 264, *id.* at 265. The *Stallworth* Court, however, was principally concerned with rejecting the idea that time starts running when the movant knows or should know of the pendency of the action. *Stallworth* did not explicitly distinguish between the time the movant became aware of an interest and the time the movant became aware of an inadequately represented interest. Nonetheless, the rationale *Stallworth* uses to reject the first position also serves to reject the majority's position.

*Stallworth* itself plainly supports my reading. *Stallworth* was originally filed by black plaintiffs employed by Monsanto Co., complaining that Monsanto's seniority system was racially discriminatory. The suit resulted in part in a consent decree restructuring seniority. When the consent decree was implemented, white employees were relatively reduced in seniority and moved to intervene to protect their seniority. The district court denied the motion because it "found that the appellants must have known of the pendency of the lawsuit at some unspecified time prior to the date on which they had filed their petition." *Id.* at 262. This Court reversed, holding that the relevant time to begin counting was when the decree was implemented and the white employees were adversely affected, rather than when they should have known of the pendency of the lawsuit.

First, the Court noted that *NAACP v. New York,* 413 U.S. 345, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973), did not "require that the date on which the would-be intervenor became aware of the pendency of the action . . . be considered for the purpose of determining whether he acted promptly." *Stallworth,* 558 F.2d at 264. Second, the Court relied on language in *United Airlines v.*

*McDonald,* 432 U.S. 385, 394, 97 S.Ct. 2464, 2469, 53 L.Ed.2d 423 (1977), measuring timeliness from the time a would-be intervenor in a class action "became aware that her interests 'would no longer be protected by the named representatives' rather than when she learned that the lawsuit was pending." *Stallworth,* 558 F.2d at 264.

Finally, the court made the following policy argument:

> Third, a rule making knowledge of the pendency of the litigation the critical event would be unsound because it would induce both too much and too little intervention. It would encourage individuals to seek intervention at a time when they ordinarily can possess only a small amount of information concerning the character and potential ramifications of the lawsuit, and when the probability that they will misjudge the need for intervention is correspondingly high. Often the protective step of seeking intervention will later prove to have been unnecessary, and the result will be needless prejudice to the existing parties and the would-be intervenor if his motion is granted, and purposeless appeals if his motion is denied. In either event, scarce judicial resources would be squandered, and the litigation costs of the parties would be increased. Such a rule would also mean that many individuals who excusably failed to appreciate the significance of a suit at the time it was filed would be barred from intervening to protect their interests when its importance became apparent to them later on. These effects would be inconsistent with two important purposes of Rule 24: to foster economy of judicial administration and to protect nonparties from having their interests adversely affected by litigation conducted without their participation. Therefore, the time that the would-be intervenor first became aware of the pendency of the case is not relevant to

the issue of whether his application was timely.

*Id.* at 264–65.[4]

Clearly, then, *Stallworth* contemplated measuring time from the point when the intervenor first became aware that his or her interests were inadequately represented. First, the language from *United Airlines* explicitly starts timing from the point of knowledge of inadequate representation. Second, the policy argument makes sense only if timing starts when the movant becomes aware of inadequate representation of its views. That argument criticizes a rule under which "[o]ften the protective step of seeking intervention will later prove to have been unnecessary." *Id.* at 265. Certainly intervention when the movant's interests are adequately represented is unnecessary, and *Stallworth* cannot be read as advocating that.

I am not the first person to read *Stallworth* in this manner. In *Piambino v. Bailey,* 610 F.2d 1306 (5th Cir.), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980), this Court addressed precisely the question before this panel. In considering the first *Stallworth* factor in determining timeliness, the *Piambino* Court stated:

> Furthermore, the question of timeliness is at least partially linked to the question of adequate representation. *See United Airlines, Inc. v. McDonald,* 432 U.S. 385, 394, 97 S.Ct. 2464, 2470, 53 L.Ed.2d 423 (1977) ("as soon as it became clear to the [intervenor] that the interests of the unnamed class members would no longer be protected by the named class representatives, she promptly moved to intervene to protect those interests"); *Allegheny Corp. v. Kirby,* 344 F.2d 571, 574 (2d Cir.1965) (timeliness also turns on "when the interests of the proposed intervenors were no longer properly represented") (construing pre-1966 rule).

---

**4.** *Stallworth* goes on to describe three other factors to be used in determining timeliness, *Stallworth,* 558 F.2d at 265–66, and then lists a factor that should be *ignored, id.* at 266: any "absolute" measure of timeliness, such as how

far the litigation has progressed when intervention is sought. I am interested to note that the majority places great rhetorical weight on this *verboten* factor.

*Id.* at 1321. Later the *Piambino* Court applied its reading of *Stallworth* to the facts of its case:

> Each of the *Stallworth* factors on timeliness points toward the conclusion that the application was timely. First, although the [movant] knew as early as June 30, 1976, when the injunction issued, that he had an interest in the litigation that might be impaired, there was absolutely no reason for him to intervene at that time. [Defendant] immediately appealed and filed a sterling brief with this Court. In addition, [defendant's] attorneys met on several occasions with the [movant and others] and assured those people that they were prosecuting the appeal diligently and in good faith. In reliance upon those representations, and upon the obvious adequate representation of [defendant's] attorneys, . . . [movant] did not attempt to intervene. On January 28, 1977, when the settlement agreement was filed, [movant] then knew that his interests were no longer adequately represented by [defendant], and his motion to intervene was filed on February 14. This delay of a mere seventeen days cannot rationally be denominated as unreasonable.

*Id.* at 1324–25 (footnote omitted). If *Stallworth* itself were not plain enough, *Piambino,* a precedent binding on this panel, makes it indisputably clear that timeliness is measured from the time the movant became aware that the original parties did not adequately represent the movant's interest in the lawsuit. Given the majority's awareness that *Piambino* establishes the principle that timeliness depends on when a movant became aware of inadequate representation of its interests, Majority Opinion at 34, I am astonished that it applied a contrary legal rule.[5]

*C. Phillips' Motion and Timeliness*

The last question regarding timeliness is whether Phillips' motion could have been timely under *Stallworth* and *Piambino.* Phillips claims that she was unaware that the Justice Department inadequately represented her interests until publication of the consent decree. If that is true, Phillips' motion was plainly timely. The appellees and the majority base their view of timeliness on the fact that Phillips was aware of, and had even participated in the negotiation of, the consent decree, and so should have been apprised of its contents earlier. That argument is unpersuasive. First, the fact of Phillips' awareness of negotiations does not imply that she *ever* knew of the government's position. Second, even if she did know of the government's initial position, it might not have occurred to her at that time that the government would soften its position and accede to a settlement leaving forty-seven percent of the black Caddo Parish students in predominantly one-race schools. The majority suggests that this result was simply the product of the normal give and take of negotiation. Phillips suggests that it resulted from a change in Justice Department policy initiated after the change in administrations.[6] The cause underlying this result is irrelevant to the issue of timeliness. The only relevant question is when Phillips knew or should have known that the Justice Department might accept such a result, when Phillips knew or should have known that her interests were inadequately represented. I see no way that this question can be determined on the record before us. Accordingly, the district court should be instructed to hold a hearing and make factual findings on when Phillips

---

5. The only other case cited by the majority on this point certainly does not conflict with the law established by *Stallworth* and *Piambino. United States v. Marion County,* 590 F.2d 146 (5th Cir.1979), involved an attempt to intervene to contest a consent decree some four years after it had been implemented. The movant there had had four years to discover its interests were inadequately represented by the parties.

6. I certainly do not suggest that the Reagan administration was not entitled to alter its enforcement policies in school desegregation cases. I merely observe that such a shift may justify intervention by people whose views were previously adequately represented by the Justice Department.

knew or should have known that her interests were inadequately represented.

## CONCLUSION

This ghost story, begun almost eighteen years ago, now draws to a mournful close. The ghost class of black school-children, the very people most vitally concerned with the vigorous defense of their constitutional rights, are not to be heard, for this final chapter of the story buries the case. In spite of three times having had their surrogate representatives change positions and acquiesce in resolutions repugnant to the ghost class, they are told their interests were adequately represented. In spite of moving to intervene within a few days of having learned of this last and most recent change in policy by the surrogate representative, the ghost class are told that their motion was not timely. This is truly a story that will scare small children.

Even worse, this is a story that will scare grown-up judges, lawyers, and citizens concerned with due process of law. Despite the long line of cases of this Circuit holding that a hearing on a motion to intervene is a fundamental measure plainly required in order to afford due process of law, Phillips' motion to intervene was denied without even granting her a hearing to support the findings of the district court. Unlike the majority and the district court, I do not believe that it is "more than clear" that Phillips' motion should be denied.

I would remand this case to the district court and direct it to hold a hearing and make findings of fact and conclusions of law. First, the court should determine whether the Justice Department adequately represented Phillips' interest in reducing the number of predominantly one-race schools substantially below the level reached in the consent decree. Such inadequacy could be shown by evidence that the Justice Department thought that the present level was sufficient, or that it did not value the case highly enough to press it to trial, or that the accoutrements of further desegregation, such as busing, violated the Justice Department's current enforcement approach. Second, if the Justice Department were found to have inadequately represented Phillips' interests for these or any other reasons, the court should determine when Phillips knew or should have known of that inadequacy and then determine timeliness accordingly.

The majority disagrees with me and sees nothing objectionable in this case. That fact does not anger me so much as frighten me. It has been many days since I first became apprised of this result, and it still gives me chills, even in broad daylight. I fervently hope it will be far off in the future on a dark, stormy night before I read another tale of the macabre as disturbing as this one.